UNITED STATES, Appellee,

v.

Dennis A. TEDDER, Captain U.S. Marine Corps, Appellant.

No. 50349.

NMCM 83 5500.

U.S. Court of Military Appeals.

July 6, 1987.

For Appellant: *Lieutenant Commander Frederick N. Ottie,* JAGC, USN (on brief).

For Appellee: *Captain W.J. Hughes,* JACG, USN and *Lieutenant David O. Vollenweider, III,* JAGC, USNR (on brief).

*Opinion of the Court*

EVERETT, Chief Judge:

A general court-martial found Captain Tedder guilty of one specification of conduct unbecoming an officer and a gentleman, as well as one specification of obstructing justice and two specifications of wrongful fraternization with an enlisted woman Marine, in violation of Articles 133 and 134, Uniform Code Military of Justice, 10 U.S.C. §§ 933 and 934, respectively. Appellant was sentenced to dismissal, confinement for 1 year, and total forfeitures.

Except for reducing the confinement to 45 days, the convening authority approved these results. The Court of Military Review set aside the finding of guilty to one specification of wrongful fraternization; but, upon reassessment, it affirmed the

sentence as approved by the convening authority. 18 M.J. 777 (N.M.C.M.R.1983). We granted review of these issues:

## I

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY DENYING THE DEFENSE MOTION TO DISMISS SPECIFICATION 3 OF CHARGE III ALLEGING OBSTRUCTION OF JUSTICE BECAUSE NO JUDICIAL PROCEEDING HAD COMMENCED AT THE TIME OF THE ALLEGED OFFENSE.

## II

WHETHER SPECIFICATION 2 OF CHARGE III [WRONGFUL FRATERNIZATION WITH LANCE CORPORAL CHIRIBOGA] FAILS TO STATE AN OFFENSE AND IS, IN ANY EVENT, VOID FOR VAGUENESS.

## III

WHETHER THE SPECIFICATION UNDER CHARGE II [CONDUCT UNBECOMING AN OFFICER BY SOLICITING NAMED WOMEN MARINES TO ARRANGE A DATE WITH CORPORAL MCCOY] FAILS TO STATE AN OFFENSE, AND IS IN ANY EVENT, VOID FOR VAGUENESS.

## I

Tedder was the unit legal officer for a squadron.[1] Lance Corporal Germaine Chiriboga, a 19–year–old woman Marine in the same squadron, testified that in early November 1982 she had consulted appellant about allegations of homosexual conduct lodged against her. Subsequently, he had conversed with her while she was on watch as assistant staff duty officer. At this

1. Appellant was not a judge advocate of the Marine Corps, but his position as legal officer was a non-lawyer billet like that of the courts-and-boards officers in some Army units.

2. The Northwoods Tavern appears to have been frequented by Marines of all ranks; and this

time, he mentioned that he frequented the Northwoods Tavern, a bar near the air station at Cherry Point, North Carolina, where both were stationed.[2] According to Chiriboga, appellant told her that, if he saw her there, he would buy her a beer. She had responded that he could do so; and Tedder then informed her that he would probably be there the next weekend.

Accompanied by another woman Marine lance corporal, she had gone to eat at the Northwoods on the next Saturday. After dinner, she went into the bar to see if appellant would arrive. Shortly thereafter, he and several friends entered the bar; and he approached her and stood next to her for about an hour. During this time, they each consumed alcoholic beverages and conversed on a first-name basis. Chiriboga testified that Tedder had told her that, if anyone asked her to explain this meeting, she should say that "it was just plain that he said that if he saw me in Northwoods, he would buy me a beer, and that was the end of it."

In the following week, appellant and Chiriboga had another conversation in which he advised her that he would be at the Northwoods on Friday evening. Again he offered to buy her a beer. Chiriboga replied that this would be acceptable; but, before going to the tavern on this occasion, she asked Sergeant Stephanie Canady of the squadron administrative office if there were Marine Corps orders concerning fraternization. Chiriboga told Canady that she was concerned because she had a date with an officer. At trial, she explained that she had been concerned that both she and Tedder might be violating some directive by their meeting.

Chiriboga then went to the Northwoods alone. She met Tedder at the bar where he and his friends purchased drinks for her.

circumstance led the Court of Military Review to set aside the finding of guilty to the specification which charged that Tedder had wrongfully fraternized with Chiriboga by meeting her there and consuming alcoholic beverages with her.

After some conversation and drinking, she accompanied him to a private club he belonged to. Later they drove to his house where they had sexual intercourse.

Appellant again instructed Chiriboga to tell anyone who inquired that he had agreed to buy her a drink if he met her at the Northwoods but not to say anything further. When the Naval Investigative Service (NIS) commenced an investigation into his conduct, he told her not to discuss the events of the evening beyond their meeting at the Northwoods. In particular, he wanted her to deny that there had been any "date" or prearrangement between them on the night in question.

Chiriboga's testimony was corroborated by that of Lance Corporal Sharon Stanton, who told the court-martial that she had accompanied Chiriboga to the Northwoods Tavern on November 13, 1982. Before leaving the base, Chiriboga had told her that she would be meeting Captain Tedder, the legal officer for their squadron, but not to mention this to anyone because he had said that "if anybody found out that he could get in trouble." Chiriboga had told her that it was not "a date" but that Tedder was going to "buy her a beer" "if they happened to meet" at the Northwoods. She also stated that Chiriboga had remarked, "We don't want anyone to know that we are meeting." They had alcoholic beverages at the Northwoods that evening with appellant and others; but neither Stanton nor Chiriboga paid for them.

Corporal Danielle Guidry testified that on November 13, Chiriboga had been riding with her. Upon seeing appellant's car at the squadron office, Chiriboga remarked that she was supposed to meet him at the Northwoods Tavern that evening. According to Guidry, she had counseled Chiriboga against that meeting. Guidry also testified that, during the course of a subsequent investigation into fraternization by appellant, Chiriboga had told her that appellant wanted Chiriboga to refrain from discussing the matter with NIS.

The Government also called Private Carol Brown, another woman Marine in the squadron to which Tedder and Chiriboga were assigned.[3] Brown worked in the same unit with Tedder; and at one time he had shared an office with her boss. On several occasions, he had asked her to get him a date with Sergeant Catherine McCoy another woman Marine. Brown had complained to NIS that Chiriboga had threatened "to rip my face off my head"; and, according to her, appellant had attempted to dissuade her from pursuing this complaint. His initial contact with her had been by telephone, when he told her, "I want you to drop the charges against Chiriboga, or else"; and he had instructed her to come to his office the next morning. When she did so, he warned Private Brown not "to ever threaten" Chiriboga "or badmouth her again or even mention her name in a conversation or there will be charges brought against you that you don't want." Moreover, Tedder told Brown "not to tell anybody about this conversation, and if I did, he would deny it, and no one would believe me." Nonetheless, Private Brown did report the conversation to NIS; and as a result, she was fitted with a device to record future conversations with Tedder.

Subsequently, in a recorded conversation, appellant had brought up the allegation that he had been wrongfully fraternizing with Lance Corporal Chiriboga; but he added that

he was not being investigated any longer, and that money talks, and that they were intimidated, and he had planned on filing in civil court and suing them. He said something about a million dollars; if he sued for a million dollars, and they defaulted, they would have to pay him a million dollars, and therefore they were going to stop the investigation because they didn't want to have to hire a civilian attorney.

Lance Corporal Michelle Rottman testified that appellant had been her "officer in charge when I was assigned to the mail room" in July through October 1982. Dur-

3. Private Brown had been a sergeant but had been reduced by the sentence at a court-martial.

ing this time, Sergeant McCoy, then a corporal, came into the unit. On "the day that she checked in," Tedder commented to her that McCoy "was good looking and she was pretty and she seemed like a nice young lady." Almost "every other day for about 2 weeks," appellant talked to Rottman about Sergeant McCoy. At one point he made "the statement that if he wasn't an officer and if she wasn't an enlisted, he wouldn't mind seeing her, but under the circumstances, he wasn't able to." Appellant, "in a round-about way," asked Corporal Rottman "to check out McCoy." On at least one occasion she had mentioned to Sergeant McCoy that appellant "said that she was good looking and that he wouldn't mind going out with her."

Sergeant McCoy testified that she had known appellant, Private Brown, and Lance Corporal Rottman while she had been assigned to their unit at Cherry Point. According to her, "There were approximately two occasions when I talked with Lance Corporal ROTTMAN, and she had mentioned the fact to me that Captain Tedder wanted to know if his future wife had checked in and if I would go to lunch with him." Although Brown had been present on these occasions, there were three other times when Private Brown had asked Sergeant McCoy "along the same lines. She hadn't mentioned anything about [his] future wife. She had just said that he wanted to know if I wanted to go out to lunch with him, and he was on Cloud Nine because I spoke to him."

The defense offered evidence which in various ways tended to refute the Government's case;[4] but Captain Tedder himself did not testify. The defense did not argue that appellant had been unaware of any Marine Corps policy or custom which would have prohibited his dating Chiriboga or McCoy. Instead, he contended that any meetings between appellant and Chiriboga

were happenstance; that nothing serious transpired; and that appellant's conduct was neither service-discrediting, prejudicial to good order and discipline, nor conduct unbecoming an officer.[5]

## II

The obstruction-of-justice specification alleges that between November 1982 and February 22, 1983, appellant had "endeavor[ed] to impede a trial by court-martial and influence and/or alter the testimony of Lance Corporal Germaine B. Chiriboga, U. S. Marine Corps as a witness before a court-martial in the case of *United States v. Captain Dennis A. Tedder*." The charges against appellant were not actually preferred until March, so appellant insists that no obstruction of justice was proved because at the time of appellant's acts, no court-martial proceeding was in existence.

We have already rejected a similar contention, *United States v. Jones*, 20 M.J. 38 (C.M.A. 1985). When Tedder sought to persuade Lance Corporal Chiriboga to lie or withhold information relevant to the investigation of potential charges against him, he was obstructing justice. He could not lawfully use tactics which tended to prevent the Government from obtaining evidence that would be needed to institute and conduct a successful prosecution against him. Neither the preferring of the charges nor their referral for trial was a prerequisite for culpability. An obstruction during the process of investigation fully suffices.

## III

In *Parker v. Levy*, 417 U.S. 733, 94 S. Ct. 2547, 41 L.Ed.2d 439 (1974), the Supreme Court considered the constitutionality of Articles 133 and 134 of the Uniform Code of Military Justice. With respect to the

---

4. Among other things, defense attempted to show that Chiriboga had not accompanied Tedder to his house. On the other hand, the prosecution offered evidence which corroborated her testimony in this regard.

5. In some respects, the defense tactics were successful, for Tedder was acquitted of two specifications of extortion based on his conversations with Private Brown.

contention that these Articles were void for vagueness, the Court decided that, due to the special needs of the unique military society, a different test should be applied to these Articles than would be used for a penal statute on which was based a prosecution in a federal district court or a state court.

■ Nonetheless, penal statutes applicable to servicemembers and military directives intended to govern their conduct must convey some notice of the standards of behavior they require. *United States v. Johanns*, 20 M.J. 155 (C.M.A.), *cert. denied*, 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 122 (1985). *Cf. Koledner v. Lawson*, 461 U.S. 352, 103 S. Ct. 1855, 75 L.Ed.2d 903 (1983). We have recognized that "not every social conduct between an officer and an enlisted man is or even can reasonably be prohibited." *United States v. Pitasi*, 20 U.S.C.M.A. 601, 608, 44 C.M.R. 31, 38 (1971).[6] In the opinion in *Pitasi*, this Court urged that appropriate directives be drafted to govern the relationships between officers and enlisted persons. In this way, notice would be provided.

The Air Force did not take this suggestion. Moreover, according to the determination of the Air Force Court of Military Review in *Johanns*, there was no custom of the service in the Air Force which prohibited dating or consensual sexual intercourse with enlisted women who were not under the accused's command or supervision. Therefore, we held that, for want of constitutionally adequate notice, Captain Johanns could not be prosecuted successfully under Articles 133 and 134 of the Uniform Code for fraternization with an enlisted person who was not under his command or supervision, when the alleged misconduct consisted only of consensual sexual intercourse.

The Army, on the other hand, has issued some directives which give notice as to various prohibited relationships between officers and certain enlisted personnel. Thus, in *United States v. Mayfield*, 21 M.J. 418 (C.M.A. 1986), this Court affirmed the conviction of an officer for wrongfully fraternizing with a female enlisted trainee assigned to his company—although not under his direct supervision—by asking her for a date. Mayfield did not contend that he was unaware of the restrictions on the relationship he had attempted to establish. Moreover, he admitted on cross-examination that he had been well aware of the command policy which prohibited dating between the command cadre and the trainees.

In *United States v. Adames*, 21 M.J. 465 (C.M.A. 1986), the accused—executive officer of a training company which included female soldiers—was convicted of conduct unbecoming an officer by reason of his "socializing with" the trainees. *Id.* at 466. Several of the trainees testified that the accused as an officer had been lowered in their esteem by this action. Most importantly, we recognized that the Army had set rules of behavior restricting social relationships between a senior and a subordinate—especially when one was a trainee being supervised by the other.

The Commandant of the Marine Corps has also attempted to provide guidance for his officers about the correct relationships with their subordinates. Paragraph 1100.4 of the Marine Corps Manual (1980) provides:

> Relations Between Officers and Enlisted Marines. Duty relationships and social and business contacts among Marines of different grades will be consistent with traditional standards of good order and discipline and the mutual respect that has always existed between Marines of senior grade and those of lesser grade. *Situations which invite or give the appearance of familiarity or undue informality among Marines of different*

---

6. In United States v. Lovejoy, 20 U.S.C.M.A. 18, 21, 42 C.M.R. 210, 213 (1970), Judge Darden, writing separately, noted his reservation as to

*grades will be avoided or, if found to exist, corrected.*[7]

(Emphasis added.)

Subsequent paragraphs quote observations on leadership by former Commandant, Major General John A. Lejeune, which appeared in the 1921 edition of the Marine Corps Manual. They compare the relationship between Marine officers and enlisted persons to "that of teacher and scholar ... partak[ing] of the nature of the relation between father and son."[8] The Manual also observes that a large portion of those persons who enlist "are under twenty-one years of age" and "in the formative period of their lives."[9]

The Marine Corps Development and Education Command has prepared a lesson plan on fraternization; and this plan, which makes reference to the Marine Corps Manual, observes that certain relationships between an officer and an enlisted person—such as that which developed between appellant and Chiriboga—are inconsistent with good order and discipline. Moreover, the Court of Military Review found that the custom of the service which prohibited an intimate relationship between officers and enlisted persons still exists in the Naval Service. *See United States v. Tedder, supra* at 781. This finding was grounded on the publication of the Manual for Courts-Martial, United States, 1984, which specifically recognized wrongful fraternization as a serious offense,[10] and on the prior case law in the Naval Service. *See, e.g., United States v. Free,* 14 C.M.R. 466 (N.B.R. 1953).

In his capacity as unit legal officer for the squadron, Tedder had some official duties that pertained to Chiriboga. Indeed, he first met her while performing those duties. Although the specification on fraternization under Article 134 does not allege that she was a "subordinate member" of his command as did the allegations in *Adames,* it appears that in some respects Tedder was her supervisor. Certainly he was in a position to affect her career by his recommendations as to appropriate action in connection with certain accusations that had been made against her.

As described in Lance Corporal Chiriboga's testimony, Tedder's own course of conduct made it clear that he did not believe that he could lawfully maintain an intimate sexual relationship with a woman Marine who was in his unit. We also observe that appellant did not contend at trial that Articles 133 and 134 were being applied to him unconstitutionally because of a lack of notice.

 Although Tedder was well aware that he should not institute a sexual relationship with Lance Corporal Chiriboga, he did so anyway and thereby prejudiced good order and discipline. Therefore, the finding of guilty of the specification alleging wrongful fraternization with Chiriboga in violation of Article 134 is valid.

IV

Lance Corporal Rottman and Private Brown were subordinates of appellant in his squadron. Nonetheless, he solicited their assistance in arranging a date for him with still another woman Marine, Sergeant (then Corporal) McCoy. Appellant never contended at trial that he was not aware that this could be conduct unbecoming an officer in violation of Article 133. Indeed, one of his remarks to Private Brown re-

whether "this practice" of fraternization was subject to prosecution.

7. The introductory paragraphs of the Marine Corps Manual (1980) state that it

is the basic publication of the United States Marine Corps issued by the Commandant of the Marine Corps and approved by the Secretary of the Navy. It is a regulatory publication for the Department of the Navy as defined in U.S. Navy Regulations.

8. At the time this passage was written, there were no women in the Marine Corps. Consequently, General Lejeune spoke of the relationship "between officers and enlisted men."

9. Indeed, as already noted, Lance Corporal Chiriboga was 19-years old at the time of these offenses.

10. Of course, this Manual was published after appellant's trial.

vealed his doubts that he could ever have a date with McCoy.

■ Long ago, the Court of Claims noted that with military officers "there is a higher code termed honor which holds ... [them] to stricter accountability." *Fletcher v. United States*, 26 Ct.Cl. 541, 563 (1891). Because of an officer's special status, a higher standard of conduct may be required of him. *United States v. Means*, 10 M.J. 162 (C.M.A. 1981); *see also United States v. Scott*, 21 M.J. 345 (C.M.A. 1986). We are unable to reconcile these standards of behavior with appellant's attempt to utilize military subordinates in his unit to procure a date for him with another enlisted person in the unit. Under the circumstances, we see no reason to disturb the finding of guilty of unbecoming conduct.

## V

The decision of the United States Navy-Marine Corps Court of Military Review is affirmed.

Judges COX and SULLIVAN concur.