**UNITED STATES, Appellee,**

v.

**Donato J. GUAGLIONE, First Lieutenant, U.S. Army, Appellant.**

**No. 56,308.**
**CM 447804.**

U.S. Court of Military Appeals.

Nov. 16, 1988.

For Appellant: *Captain Scott A. Hancock* (argued); *Colonel Brooks B. LaGrua* and *Major Eric T. Franzen* (on brief); *Colonel John T. Edwards, Lieutenant Colonel Charles A. Zimmerman, Lieutenant Colonel Paul J. Luedtke, Captain Keith W. Sickendick.*

For Appellee: *Captain Patrick A. Hewitt* (argued); *Colonel Norman G. Cooper, Lieutenant Colonel Gary F. Roberson, Captain Vito A. Clementi, Captain Richard D. Rubino* (on brief); *Captain Gary L. Hausken.*

*Opinion of the Court*

EVERETT, Chief Judge:

Contrary to his pleas, First Lieutenant Guaglione was convicted by a general court-martial of one specification of wrongful use of marijuana, and three specifications of conduct unbecoming an officer—namely, by fraternizing with enlisted soldiers during a visit to a house of prostitution, by allowing enlisted men to use hashish in his presence, and by himself using hashish in the presence of enlisted men, in violation of Articles 112a and 133, Uniform Code of Military Justice, 10 USC §§ 912a and 933, respectively. The members sentenced appellant to be dismissed from the Army; and the convening authority approved this sentence.

The Court of Military Review concluded that the specification alleging wrongful use of marijuana was necessarily included in that which alleged use of marijuana in the presence of enlisted men. Therefore, it set aside the findings of guilty to the former and dismissed the Article 112a charge and its specification. The remaining findings and the sentence were affirmed.

We granted appellant's petition to consider these issues:

I

WHETHER THE EVIDENCE IS SUFFICIENT AS A MATTER OF LAW TO SUPPORT A FINDING OF GUILTY TO SPECIFICATION 1 OF CHARGE II (CONDUCT UNBECOMING AN OFFICER).

II

WHETHER THE MILITARY JUDGE ERRED BY ADMITTING INTO EVIDENCE, OVER DEFENSE OBJECTION, THE PRIOR WRITTEN STATEMENTS OF PRIVATES FIRST CLASS MICHAEL M. DIAZ AND KEVIN M. KENNEDY.

Also, appellant has filed with us a petition for new trial, which is predicated on the recantation of the testimony of Private First Class Thomas Sawyer, a principal prosecution witness.

I

This case had its beginnings in the late summer of 1984 at Bad Hersfeld, Federal Republic of Germany, when appellant's unit formed a softball team. The team included Guaglione, a number of other officers, a warrant officer, and several enlisted soldiers. Among the enlisted members were Privates First Class Kennedy, Diaz, and Sawyer. Despite the natural closeness engendered by such activity, proper military courtesy was observed; and the junior members of the team referred to appellant as "Lieutenant G." Neither Kennedy, Diaz, nor Sawyer was directly subordinate to appellant.

In September of that year the team entered a tournament sponsored by the unit's parent command. This contest was held in Darmstadt, some distance from their assigned installation. After the team had been eliminated on September 6, the members arranged car pools among themselves for the return trip to Bad Hersfeld; and Kennedy, Diaz, and Sawyer rode back with

Lieutenant Guaglione. Enroute, the passengers bought and consumed an alcoholic beverage. Guaglione did not partake thereof—presumably because he was driving.

The parties stopped in Frankfurt for food. After consuming hamburgers at a fast-food outlet, they decided to visit the nearby "red light district." The houses of prostitution in this area were legal; and one witness at the trial described them as being "a tourist attraction." There was no evidence that the area had been declared off-limits by any military commander.

The four men remained for about an hour. During this period, Kennedy and Diaz partook of the services available, and Sawyer purchased some hashish. Guaglione entered two of the houses of prostitution; but, while there, he did nothing more than look and comment on the physical charms of the hostesses. After the visit to the brothels, the journey to Bad Hersfeld resumed.

The remaining events of the trip and its immediate aftermath are subject to dispute. On October 23 and 24, 1984, the three enlisted men gave sworn statements to a special agent of the Criminal Investigation Command (CID). In those statements the trio related that, after departing Frankfurt, they had smoked a portion of the hashish purchased by Sawyer. In their initial interviews, all three soldiers agreed that Lieutenant Guaglione did not consume any hashish while driving. Those statements assert, however, that, upon arrival at Bad Hersfeld, appellant took them to his apartment, where they all used the remaining hashish.

Sawyer's initial statement also asserted that he had used the substance with a number of commissioned and noncommissioned officers. Two days later, he executed a second statement wherein he recanted that portion of his original statement. About 1 month later, Diaz and Kennedy repudiated their original statements and denied that Lieutenant Guaglione had used hashish. Guaglione also provided a

statement to the CID. He denied using hashish and specifically stated that he neither had seen Sawyer purchase hashish nor allowed the soldiers to visit his quarters.

Over timely objection, the original statements by Diaz, Sawyer, and Kennedy were admitted into evidence under Mil.R.Evid. 803(24), Manual for Courts-Martial, United States, 1984, this being one of two "residual" exceptions to the hearsay rule. *Cf.* Mil.R.Evid. 804(b)(5). Diaz and Kennedy testified that their original statements had been false and were the product of pressure by the investigators. Sawyer generally agreed that his second version of the events was true; and he testified fairly consistently with that statement at trial.[1]

Testifying in his own behalf, Guaglione denied any criminal misconduct, although he admitted visiting the houses of prostitution. This visit he attributed to his own "personal curiosity," that is, "[t]o to see what those houses looked like, what was there, what was available." In this connection, he asserted that, although his enlisted passengers had been in the "red-light district" before, he had never before seen "legalized prostitution." Guaglione asserted that he had not allowed the soldiers to smoke marijuana or to visit his quarters. Although he admitted to preservice experimentation with marijuana while in high school and due to peer pressure, he denied use of the substance on September 6, 1984. Guaglione's defense attorneys presented evidence of his excellent military character and Sawyer's lack of credibility.

Appellant's battery and battalion commanders testified that his conduct in visiting the houses of prostitution had displayed "poor judgment" but had not demeaned him as an officer. The battalion commander, Lieutenant Colonel Leverett, an officer of some 23 years' military service, refused to describe appellant's conduct as "unbecoming" despite trial counsel's repeated attempts to so characterize it during cross-examination. Also, the former first sergeant of the battery to which

1. All in all, Sawyer has provided at least five versions of the disputed events.

Guaglione was assigned testified that, on the basis of his own experience and knowledge of the customs and standards of the Army, appellant's act was only "[p]oor judgment." This witness had served in the Army for 27 years at the time of trial.

The Government's only rebuttal witness was the brigade commander, Colonel A.W. Schulz. Testifying in response to a hypothetical question based on the facts of this case, he stated on direct examination, "I do not believe the conduct is acceptable." When asked whether the visit to the house of prostitution "rises to the level ... that would disgrace him as an officer," he responded, "I think it comes very close. It might be very, very poor judgment and it is [sic] certainly borderlines on conduct unbecoming."

## II

The first specification alleges unbecoming conduct, in that Guaglione was "fraternizing with Private First Class Thomas A. Sawyer, Private First Class Michael M. Diaz, and Private First Class Kevin N. Kennedy, while visiting an establishment known for prostitution activities, on terms of military equality ..." To prove that appellant violated Article 133, the Government was required to show not only that Guaglione had visited the brothels with the three enlisted members but also "[t]hat, under the circumstances [this] ... constituted conduct unbecoming an officer and gentleman." Para. 59b(2), Part IV, Manual, *supra.*

According to Colonel Winthrop, unbecoming conduct was that which not only disgraced the accused personally but seriously compromised his standing as an officer. W. Winthrop, *Military Law and Precedents* 713 (2d ed. 1920 Reprint). The most recent edition of the Manual for Courts-Martial has adopted this formulation almost without change. Para. 59c(2), Manual, *supra. See also* J. Snedeker, *Military Justice Under the Uniform Code* 889 (1953); G. Davis, *A Treatise or the Military Law of the United States* 470 (1913).

In determining whether Guaglione's visit to the house of prostitution constituted such conduct, we accept the premise that a commissioned officer may be held to a higher standard of accountability for his conduct than an enlisted member or a civilian. *United States v. Tedder,* 24 MJ 176, 182 (CMA 1987); *United States v. Means,* 10 MJ 162 (CMA 1981); *cf. Fletcher v. United States,* 26 Ct.Cl. 541 (1891); *see also United States v. Court,* 24 MJ 11, 17 n. 2 (CMA 1987) (Cox, J., concurring). However, not every delict or misstep warrants punishment under Article 133. In general, it must be so disgraceful as to render an officer unfit for service. *United States v. Clark,* 15 MJ 594 (ACMR 1983); *Winthrop, supra* at 712–13; *Davis, supra* at 469; *see also United States v Giordano,* 15 USCMA 163, 35 CMR 135 (1964). This requirement for conviction is consistent with the mandatory dismissal of an officer that was prescribed by the Articles of War (AW) for unbecoming conduct. *See* AW 95 (1916); AW 61 (1874); AW 83 (1806); *see also* para. 457, Naval Courts and Boards, 1937, at 237.

There is no evidence that Guaglione participted in any sexual activity while in the Frankfurt "red-light district" or that he encouraged any of the enlisted members to do so. They already were familiar with this district, while Guaglione had never seen "legalized prostitution" before. There is also no evidence that, while they were in the houses of prostitution, any of the three soldiers addressed Guaglione in any familiar way, failed to show him military courtesy, or committed a breach of military decorum. Moreover, no American commander had attempted to prohibit American servicemembers from entering these brothels by declaring them off-limits; and they were lawful under German law.

Among the examples of unbecoming conduct listed in the Manual for Courts-Martial is "public association with known prostitutes." Para. 59c(3), *Manual, supra. Cf. United States v. Hooper,* 9 USCMA 637, 646–47, 26 CMR 417, 426–27 (1958)

(specification alleging that retired rear admiral had "publicly associate[d] with persons known to be sexual deviates, to the disgrace of the armed forces" held sufficient under Article 133).[2] Moreover, in one case, the Army Board of Review affirmed the conviction of an officer who visited a house of prostitution, *United States v. Rice*, 14 CMR 316, *pet. denied*, 4 USCMA 725, 15 CMR 431 (1954).

We do not conclude, however, that "public association" within the contemplation of the Manual occurs when a young officer not in uniform merely walks through a German "red-light district" or even enters a house of prostitution. For one thing, "public" denotes something that is open or generally known, *see Webster's Ninth New Collegiate Dictionary* 952 (Merriam Webster 1988); and Guaglione's activity in Frankfurt on September 6 was not either generally known at the outset or intended to be generally known. More importantly, we do not believe that ogling the wares in a brothel constitutes "association"; instead, the contact must be physical or, if not physical, must be continued over a substantial period of time.

■ We recognize that an officer's conduct may be "unbecoming" for purposes of Article 133 even though it is private and even though it may not violate some other punitive article. *United States v. Norvell*, 26 MJ 477 (CMA 1988). However, the disgraceful aspect of the "association with known prostitutes" is apparently that it is "public" and so represents an open flouting of community morals. Here, Guaglione's conduct was quite lawful insofar as the local community was concerned.

The *Rice* decision is distinguishable. There, the accused was charged with entering the house of prostitution in the company of enlisted men for the purpose of engaging in sexual intercourse. The evidence showed that his entire purpose in making the expedition of that evening was to purchase sex. Moreover, the house of ill fame

was in an area which was clearly marked as being off-limits and had been so designated by a general officer.

Despite the high standards of accountability to which an officer is held, it still is necessary that, through custom, regulation, or otherwise, he be given notice that his conduct is unbecoming. *Cf. United States v. Johanns*, 20 MJ 155 (CMA), *cert. denied*, 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 122 (1985). In this connection, we recognize that participation on an athletic team tends to be an equalizer and that the members of the team tend to evaluate one another in terms of athletic ability rather than military rank. When officers and enlisted members play on the same team, it is inevitable that some relaxation of usual military decorum will occur and that there will be some modification of ordinary military relationships. Obviously, military authorities have come to the conclusion that, whatever the disadvantage of this relaxation may be, there are many offsetting advantages; and we are well aware that many military units have teams on which both officers and enlisted persons participate. The camaraderie that results under these circumstances must be taken into account in determining whether unlawful "fraternization" has occurred in violation of service custom.

With this in mind, we cannot ignore the testimony of Guaglione's own battery commander and battalion commander—persons from whom he would be expected to receive guidance as to his military responsibilities—that his conduct constituted no more than "poor judgment." Likewise, the first sergeant, with extensive military experience, was unwilling to characterize appellant's conduct as unbecoming. The testimony even of Colonel Schultz, appellant's brigade commander, who was a rebuttal witness, is so equivocal as to undermine the Government's position.

We conclude that the Government has failed to show that Guaglione had been

**2.** *See also Hooper v. Laird*, 19 USCMA 329, 41 CMR 329 (1970); *Hooper v. United States*, 164 Ct.Cl. 151, 326 F.2d 982, *cert. denied*, 377 U.S. 977, 84 S.Ct. 1882, 12 L.Ed.2d 746 (1964); *Hooper v. Hartman*, 163 F.Supp. 437 (S.D.Cal.1958), *aff'd*, 274 F.2d 429 (9th Cir.1959).

given the requisite notice that his conduct would be considered "unbecoming." *Cf. United States v. Johanns, supra.* Accordingly, appellant's conviction under specification 1 of Charge II for fraternizing in violation of Article 133 cannot stand.

### III

In *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), the Supreme Court upheld a California statute which authorized introduction of a witness' prior statement as substantive evidence. The Court concluded that the requirements of confrontation were satisfied, because the witness was present to be observed by the factfinder and could be cross-examined about the testimony he gave on the stand, as well as about the earlier statement.[3]

The rationale for this result was stated long ago by Judge Learned Hand in *DiCarlo v. United States,* 6 F.2d 364 (2d Cir.), *cert. denied,* 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168 (1925), when he observed that the witness

> is present before the jury, and they may gather the truth from his whole conduct and bearing, even if it be in respect of contradictory answers he may have made at other times.... The possibility that the jury may accept as the truth the earlier statements in preference to those made upon the stand is indeed real, but we find no difficulty in it. If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court. There is no mythical necessity that the case must be decided only in accordance with the truth of words uttered under oath in court.

*Id.* at 368.

Although this view has considerable support, it was not adopted by either the Military Rules of Evidence or the Federal Rules of Evidence. In describing statements which are not hearsay, Mil.R.Evid. 801(d) and its twin Fed.R.Evid. 801(d) specify (1) certain prior statements by a "declarant [who] testifies at the trial or hearing and is subject to cross-examination concerning the statement" and (2) certain admissions by a party-opponent. To fit within the first category, the statement must be:

> (A) inconsistent with the declarant's testimony, and ... given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive, or (C) one of identification of a person made after perceiving the person.

Mil.R.Evid. 801(d)(1); Fed.R.Evid. 801(d)(1).

By implication, any other prior statement by a witness is hearsay. Accordingly, it is not admissible except as provided by some other rule. *See* Mil.R.Evid. 802. If such an exception exists, it must be found in Mil.R.Evid. 803 (hearsay exceptions; availability of declarant immaterial) or Mil.R. Evid. 804 (hearsay exceptions; declarant unavailable). Clearly, Kennedy and Diaz were not "unavailable"—as that term is defined by Mil.R.Evid. 804(a). This leaves only Mil.R.Evid. 803; and, in turn, the only hearsay exception that might fit here is Mil.R.Evid. 803(24)—the "residual exception." Indeed, this was the exception on which trial counsel and the military judge relied for admission of the earlier statements by Kennedy and Diaz.

Under Mil.R.Evid. 803(24), a statement which is not included within any of the preceding 23 hearsay exceptions "but having equivalent circumstantial guarantees of trustworthiness," may be admitted

> if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than

---

**3.** In *Green,* the prior statements consisted of testimony given at a preliminary hearing where the witness had been subjected to extensive cross-examination. Thus, the Court's pronouncement seems to be broader than was required by the facts of the case.

any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and in the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the intention to offer the statement and the particulars of it, including the name and address of the declarant.

■ According to the legislative history of Fed.R.Evid. 803(24), which corresponds to Mil.R.Evid. 803(24), the residual exception was to "be used very rarely and only in exceptional circumstances." S.Rep. No. 1277, 93d Cong., 2 Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 7051, 7066. Accordingly, all prerequisites for use of the residual exception must be satisfied, unless they are waived by the party against whom the statement is being introduced. *United States v. Iaconetti*, 406 F.Supp. 554 (E.D. N.Y.) (opinion by Judge Weinstein), *aff'd*, 540 F.2d 574 (2d Cir. 1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977); *see also* 4 J. Weinstein and M. Berger, *Weinstein's Evidence*, para. 803(24)[1] at 803–378 to 803–379 (1988); S. Saltzburg, L. Schinasi, and D. Schuleter, *Military Rules of Evidence Manual* 654 (2d ed. 1986).

It seems clear that not every prior statement by a declarant who "testifies at the trial or hearing and is subject to cross-examination concerning the statement" (Mil. R.Evid. 801(d)(1)) was intended to be admissible under Mil.R.Evid. 803(24). Otherwise, there would have been no point in setting forth the limitations which are contained in Mil.R.Evid. 801(d)(1), since they could always be bypassed. Thus, the question is, which prior statements that cannot be admitted under Mil.R.Evid. 801(d)(1) qualify for admission under Mil.R.Evid. 803(24).

At the outset it seems curious that a prior statement by a witness who testifies willingly in court, is in good physical condition, and does not profess to any lack of memory could be "more probative" than testimony offered in court on the same point by a witness who can be observed by the factfinder and is subject to cross-examination. However, this Court apparently has been satisfied that in some instances a prior statement can be "more probative," for we have upheld admission of a pretrial statement of a witness who testified. *United States v. Powell*, 22 MJ 141 (CMA 1986). However, we did "caution against an overly mechanistic application of our holding" in that case; and we called for "the balancing of a variety of circumstances unique to a particular case." *See id.* at 145.

■ In this case, the military judge attempted to undertake the necessary "balancing." We disagree, however, with his conclusion that the pretrial statements of Kennedy and Diaz qualified for admission under Mil.R.Evid. 803(24).

In the first place, the pretrial statements were made to criminal investigators—who often "are not merely observing and evaluating but are seeking to build a case to prove guilt." *See United States v. Cordero*, 22 MJ 216, 223 (CMA 1986). Admittedly, a pretrial statement to a police officer is not automatically inadmissible under Mil.R. Evid. 803(24); in *Powell* the pretrial statement which was admitted had been made to the police. However, just as in *Cordero* we considered it to be significant that the pretrial statement of the unavailable witness had been made to a police officer, so, too, we attach importance to the circumstance that the pretrial statements of Kennedy and Diaz were made to criminal investigators.

In *Cordero* we concluded that, in view of the technique of the interrogation that was employed, "the statement obtained is in some respects the product of the investigator, rather than of the purported declarant." *See* 22 MJ at 222. In the present case, we also are concerned about the circumstances under which the pretrial statements were obtained. Both the battery

commander and the battalion commander testified that there had been complaints about the interrogations during the investigation which ultimately led to the charges against Guaglione. Certainly, the CID pressed hard to obtain statements. For example, according to his own testimony, Special Agent Jones used this technique in obtaining Private Diaz' statement:

> I reached inside my drawer, the desk there and pulled out a hometown news release and started filling it out. This is an investigator's tool that we use sometimes in certain circumstances and started filling it out. And Diaz says, what are you doing? And I said I am filling out a hometown news release. And he says, where does that go? And I said, it goes to your hometown newspaper about, you know, this incident. And he says, do you have to use that? And I says, no, I don't. And he says, you know, if I talk to you, will you not send that in? And I said, okay, I won't. And that is when he admitted to the incident in the car and gave me the sworn statement that he gave me.

Even though the investigators' tactics may not have rendered the pretrial statements involuntary, it is clear that Kennedy and Diaz were under great pressure to make statements; and the voluntariness of a statement has always been considered relevant to its reliability—as court-martial members and jurors are routinely instructed. Jones had already obtained information from Sawyer, so a special hazard existed that, in later interrogations of other persons, he would rely heavily on the input he had already received and might tend unconsciously to suggest to the witnesses the answers he wanted. Furthermore, almost 7 weeks had passed between the trip to Darmstadt and the statements to the CID, the inevitable result being some diminution of recollection and increased suggestibility on the witnesses' part. Finally, no physical evidence was available to corroborate the pretrial statements and assure their reliability.

Mil.R.Evid. 803(24) requires that the pretrial statement be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." We observe that the Government did have available another witness to the events—Private Sawyer; and his live testimony—which not only could be "procure[d] through reasonable efforts" but, in fact, was offered by the Government—appears to be "more probative" than the pretrial statements of Kennedy and Diaz. Moreover, in light of the availability of Sawyer's testimony, the necessity for use of the pretrial statements was diminished.[4]

Apparently recognizing this problem, the military judge specifically asked trial counsel to address it during his argument on admissibility of the statements. Trial counsel's only response was that "there is no other evidence available other than those three people." Although there appear to be few opinions on this aspect of the residual hearsay exception,[5] United States Courts of Appeals have held in the following cases that, if a party who proposes to introduce a pretrial statement under the "residual exception" has a witness who will testify in court to the facts sought to be provided, the trial judge should not admit the statement under Fed.R.Evid. 803(24).

In *United States v. Welsh*, 774 F.2d 670 (4th Cir.1985), the Government proffered the statement of an unavailable declarant as substantive evidence on the issue of interstate transportation of stolen property. A second witness, whose credibility was somewhat suspect, also was available to testify as to those facts. The trial judge excluded the hearsay statement, and the Government appealed. The Fourth Circuit sustained the trial judge's conclusion that

---

**4.** According to some scholars, such as Dean Wigmore, necessity and trustworthiness provide the rationale for the hearsay exceptions.

**5.** Perhaps there are few cases in which a party wishes to offer the pretrial statements of a witness whom he has available to testify as to the same matters.

the live witness was more probative than the extrajudicial statement. It also ruled that the questionable credibility of a live witness would not change the result. Similarly, the Eighth Circuit held that, where a witness was available to testify that she had coached successful candidates for a promotion examination, the trial judge properly excluded her statement to another witness to the same effect. *Netterville v. Missouri,* 800 F.2d 798 (8th Cir.1986).

Even in cases where admission of the extrajudicial statement has been upheld, it seems that little, if any, live testimony was available to the proponent about particular facts for which the statement was being received. For example, in *United States v. Leslie,* 542 F.2d 285 (5th Cir.1976), the extrajudicial statements introduced by the United States were the only evidence which the prosecutor could produce, and so the rationale of necessity, which seems implicit in Fed.R.Evid. 803(24)(B), was applicable.

The military judge attributed great probative value to the pretrial statements of Kennedy and Diaz on the theory that those statements were against the declarants' penal interest.[6] However, in view of the context in which the statements of Kennedy and Diaz were taken, to say that they were against their penal interest is misleading.

Courts have often recognized that when two persons are in trouble, each is likely to place most of the responsibility on the other's shoulders if they both are interviewed by the police. *Cf. United States v. Cordero, supra* at 223; *Lee v. Illinois,* 476 U.S. 530, 544, 106 S.Ct. 2056, 2064, 90 L.Ed.2d 514, 528 (1986). Similarly, Kennedy and Diaz may have anticipated that they would have gained from making pretrial statements that incriminated Guaglione—a person as to whom the interrogators either had expressed an interest or were likely to have

an interest. Certainly, a guilty person who provides investigators with information they want about others will often receive more favorable treatment.

■ The test of admissibility for reception of an extrajudicial statement as an admission against penal interest under Mil. R.Evid. 804(b)(3) is that the declarant himself recognized at the time that it was against his penal interest. *Cf. United States v. Baran,* 22 MJ 265, 269 (CMA 1986) (Everett, C.J., concurring). If the reliability of a pretrial statement offered under Mil.R.Evid. 803(24) results from its being against the declarant's penal interest, then for admissibility, it must appear that the declarant himself recognized that the statement was against his penal interest. *Cf. United States v. Baran, supra.* Here, that test has not been met.[7]

In view of our premise that Mil.R.Evid. 803(24) was intended to be applied sparingly, we are unconvinced that the requirements of that rule have been met. There is no constitutional prohibition against a change of the Military Rules of Evidence to allow admissibility under such circumstances. *Cf. California v. Green, supra.* However, under the Military Rules of Evidence as they now exist—or, for that matter, under the Federal Rules of Evidence—we conclude that the statements of Kennedy and Diaz should not have been received as substantive evidence of facts recited therein over objection by the accused's counsel.

■ Finally, we turn to prejudice. Since the military judge instructed the members that they could consider the statements for their truth and the Government argued not only that they were true but also that they corroborated Sawyer, whose credibility had been eviscerated by the defense, we conclude that the error was prejudicial. *Cf.*

---

**6.** These statements could not be introduced under Mil.R.Evid. 804(b)(3) as statements against interest because the declarants were not "unavailable"—as is required under Mil.R.Evid. 804.

**7.** The military judge concluded that the accusations by Kennedy and Diaz against Guaglione

were so "interwoven" with their own incriminating admissions as to be against the penal interest of the declarants. From our analysis of the evidence we are not satisfied in this regard; and certainly we are not so satisfied as to believe that they have the "probative value" which the military judge attributed to them.

*United States v. Weeks*, 20 MJ 22 (CMA 1985).

## IV

The decision of the United States Army Court of Military Review is reversed as to the approved findings of guilty and the sentence. Said findings and the sentence are set aside. Specification 1 of Charge II is dismissed. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered as to the remaining specifications and the sentence.

The petition for new trial is dismissed as moot.

Judge SULLIVAN concurs.

COX, Judge (concurring with reservations):

The decision whether to admit out-of-court statements often presents intriguing issues under the Military Rules of Evidence, Manual for Courts-Martial, United States, 1984. Some statements are admissible for their impeachment value, not as affirmative evidence. Mil.R.Evid. 607. Others may be admitted without restriction as nonhearsay, if they satisfy Mil.R.Evid 801(d)(1)(A) (prior inconsistent, sworn statement of witness, given at a trial, hearing, other proceeding, or deposition). Still others may be admitted as exceptions to the rule against hearsay under the numerous categories described in Mil.R.Evid. 803 and 804.

Two of the more challenging hearsay exceptions are Mil.R.Evid. 803(24) and 804(b)(5)—the so-called residual hearsay provisions. The range of circumstances permitting admission of out-of-court statements under these provisions has not yet fully evolved. An especially interesting situation is presented when, as here, the declarant is available for cross-examination at trial (thus eliminating confrontation problems), and he testifies in a manner inconsistent with a pretrial statement.

*United States v. Powell*, 22 MJ 141 (CMA 1986), was such a case, and we con-cluded that the military judge did not abuse his discretion in admitting the prior inconsistent statement. Our holding was based on multiple factors peculiar to the case, including the circumstances immediately attending the declaration, availability of the declarant at trial to be cross-examined, independent corroboration of the content of the out-of-court statement, internal inconsistency in the declarant's trial testimony, and evidence "that she misled trial counsel as to the" purport "of her testimony" right "up to the moment of trial." 22 MJ at 145.

Arguably, another scenario rising to the "equivalent circumstantial guarantees of trustworthiness" standard of Mil.R.Evid. 803(24) is when a prior inconsistent statement of a witness interlocks with an accused's admission. *See United States v. Koistinen*, 27 MJ 279 (CMA 1988); *cf. United States v. Yeauger*, 27 MJ 199 (CMA 1988); *United States v. Hines*, 23 MJ 125 (CMA 1986).

To decide this case, however, I need only look to the circumstances surrounding the taking of declarant's statements, coupled with the lack of reliable corroboration. It is evident from the record that the investigators here were primarily interested in the "officer" aspect of the case. As appellant had already been implicated by a highly impeachable source, the investigators understandably focused on collecting more and better evidence. The methods they employed, however, as outlined in the majority opinion, led to production of extremely questionable information. *Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986); *United States v. Dill*, 24 MJ 386 (CMA 1987). For this reason, I conclude that the trustworthiness standard of Mil.R.Evid. 803(24) was not met.

I do not join the majority opinion's intimation that existence of a witness, however impeachable, who is still willing to testify in accordance with a proponent's theory, should ordinarily block introduction of statements of other witnesses who have since changed their tune and are now adverse to the proponent, *on the ground that the first witness' testimony is more pro-*

*bative.* 27 MJ at 274, 275–276. I prefer not to make *in vacuo* general pronouncements of law on such subjective and individualistic matters. I note that the cases cited by the majority for this proposition are inapposite to the facts at bar. Further, such a doctrine would make "getting" to a witness a particularly rewarding project for any party likely to be damaged by a prior statement.

I also do not join in the gloss on Mil.R. Evid. 804(b)(3) (declaration against penal interest) that "it must appear [*i.e.*, the Government must prove or risk nonadmission] that the *declarant himself* recognized that the statement was against his penal interest." 27 MJ at 276 (23) (emphasis added). I believe the objective standard explicitly set forth in the rule ["a reasonable person in the position of the declarant would not have made the statement unless the person believed it to be true"] speaks for itself.

With these reservations, I concur in the majority opinion.