UNITED STATES, Appellee

v.

LENARD LOWE, Private E-1, U. S. Army, Appellant

4 USCMA 654, 16 CMR 228

No. 4620

Decided August 13, 1954

Lᴛ Cᴏʟ James C. Hamilton, U. S. Army, Cᴀᴘᴛ William C. Irby, U. S. Army, 1sᴛ Lᴛ Robert C. Taylor, U. S. Army, and 1sᴛ Lᴛ Richard B. Dempsey, U. S. Army, for Appellant.

Lt Col William R. Ward, U. S. Army, 1st Lt Paul D. Heyman, U. S. Army, and 1st Lt Elliott H. Eisman, U. S. Army, for Appellee.

## Opinion of the Court

**Robert E. Quinn, Chief Judge:**

Tried on four charges, the accused was acquitted of two, alleging violations of Article 128, Uniform Code of Military Justice, 50 USC § 722; but convicted of violating Articles 92 (Charge II) and 134 (Charge III), respectively, Uniform Code of Military Justice, 50 USC §§ 686, 728. He was sentenced to a bad-conduct discharge, partial forfeiture, and confinement at hard labor for eighteen months with the court considering evidence of two previous convictions. The convening authority reduced the period of confinement to twelve months but otherwise affirmed. A board of review affirmed without opinion. We granted review to consider the following issues:

"1. Whether Footnote 5 is applicable to the punishment permitted under Charge II.

"2. Whether the evidence is sufficient to support the findings on Charge III."

The specifications of which the accused stands convicted are as follows:

"Specification: In that Private (then Corporal) Lenard Lowe, U. S. Army, Company A, 759th Military Police Battalion, did, at Berlin, Germany, on or about 28 June 1953, violate a lawful general order, to wit: paragraph 2h, Circular 21, Headquarters Berlin Command, dated 2 March 1953, by carrying a knife with a blade longer than three inches. [Charge II.]

"Specification: In that Private (then Corporal) Lenard Lowe, U. S. Army, Company A, 759th Military Police Battalion, was, at Berlin, Germany, on or about 11 June 1953, drunk and disorderly in uniform in a public place, to wit: at or near #5 Solmsstr., Berlin SW 29." [Charge III.]

Between two and three p. m. on June 11, 1953, the accused visited his girl friend. They had known each other for about seven months. The girl was a tenant in an apartment occupied by a Mr. and Mrs. Kohlstedt and their children. The accused brought with him two "half bottles" of cognac. He and the girl consumed both in the course of the afternoon. At about seven p. m. they started to quarrel over a wrist watch. When the accused forcibly took the watch, the girl sought Mr. Kohlstedt's assistance. He was then visiting his neighbor in the latter's apartment "in the same house, and the entrance doors are one next to the other." Kohlstedt went to see the accused. He met him at his own door and told him, "If you want to steal at our place you don't have to come back again, go." He "prohibited" the girl from permitting the accused to visit her in the apartment, and he then went back to his neighbor's flat.

After Kohlstedt had gone, the accused "pleaded to be let in." The girl yielded. About 9:30 or 10:00 p. m. Kohlstedt returned. On seeing the accused, he told him to leave "because I could tell that he was tipsy." A discussion arose over the accused's laundry, which was then in the process of being washed. Eventually, it was assembled, placed in a bag and given to the accused. He started toward the front door, with Mr. Kohlstedt behind him. According to Kohlstedt, the accused suddenly dropped the laundry, turned around, and "grabbed me here in front and shoved me back into the kitchen." In the struggle, Kohlstedt seized a hatchet. He grabbed it by the handle, and, apparently simultaneously, the accused clutched the blade. However, Mrs. Kohlstedt, a neighbor, and the accused's girl friend succeeded in taking the hatchet from them. Mr. Kohlstedt then placed it behind the stove in the bedroom.

Some order was restored, and it seemed as if accused would then leave. Instead, he took out a knife and resumed the fight with Kohlstedt. The latter "broke free" and ran out of the

656

apartment. However, his "wife was standing in . . . [his] way on the staircase" and the accused was able to catch up with him. Just then the military police arrived.

As previously noted, Mr. Kohlstedt testified that the accused was "tipsy." He also said that the accused smelled "strongly of alcohol," and that he later fell asleep in the military police jeep. Corroborating this testimony is that of the accused's girl friend. She said that he was "drunk" and "rather tipsy." She also testified that the accused "can stand a lot of alcohol, but you could say that he was tipsy." Other evidence relating to the accused's condition appears in an oral stipulation of expected testimony of Sergeant Randell, a military policeman, who took the accused into custody. According to him, the accused "had a smell of cognac on his breath but did not appear . . . to be under the influence of alcohol." No blood alcohol test was given.

On June 28, 1953, accused became involved in another altercation with the same girl. This incident occurred on a public street. As a result, the accused was arrested by the Military Police. In searching him, they found a knife in the inside pocket of his Eisenhower jacket. It had a fixed open blade measuring four and three-quarters inches in length. Possession of this knife is charged as a violation of Circular 21, Headquarters, Berlin Command. Paragraph 2h of the Circular provides as follows:

"The carrying on the person of straight razors, knives (other than small pocket knives with blades not longer than 3 inches), blackjacks, metal knuckles, billys, sandbags, or any other weapons of any kind is prohibited, except that the carrying of knives while on authorized hunting or fishing, or en route thereto or therefrom is permitted."

The court took judicial notice of the Circular. It was shown that in the period between April and early June 1953, a copy of the Circular was posted on the permanent bulletin board of the accused's then organization. All enlisted personnel were "requested and directed" to read the bulletin board at least twice a day.

For convenience, we consider first the sufficiency of the evidence to support the conviction under Charge III. Although in his closing argument at the trial, defense counsel conceded that "there is testimony that . . . [the accused] was drunk" but that he "prefer[ed] to believe Sergeant Randell, the military policeman," the accused now maintains that the evidence is insufficient to establish drunkenness. We find no merit in this contention.

Accused's girl friend and drinking companion described him as "drunk" and "rather tipsy." The latter description was also used by Mr. Kohlstedt. In common speech, "tipsy" describes a person "under the influence of strong drink; . . . but not absolutely drunk." Webster's New International Dictionary, 2 ed, page 2653. This testimony of the accused's condition was admissible. When relevant, a witness may properly give his impression of the state of intoxication of another. Manual for Courts-Martial, United States, 1951, paragraph 138e, page 242. True, in accordance with technical rules of evidence the testimony of these witnesses should not have been received. However, in United States v. Marshall, 2 USCMA 54, 6 CMR 54, we considered similar testimony by a foreign-speaking witness, testifying through an interpreter. We there said (page 58):

". . . However, the prosecution witnesses who used this term were Korean nationals. The actual words used by the witnesses were translated into English by an interpreter. None of the witnesses was highly educated. It appears likely that the witnesses or the interpreter used the word as a statement of fact as to what was observed. As such, it would be proper. See United States v. DeCarlo (No. 32), 1 USCMA 90, 1 CMR 90, decided December 28, 1951. But we place here more stress on the fact that the witnesses involved were uneducated persons speaking in a foreign language. The niceties of rules of evidence involving testimonial lim-

itations cannot reasonably be rigidly enforced under such circumstances. Because of this and because defense offered no objection to the testimony, we cannot say that it constituted prejudicial error."

The prosecution evidence of drunkenness may have been disputed by the stipulated testimony of Sergeant Randell. However, determination of any conflict was for the court, as triers of the facts. They found against the accused, and the finding is supported by substantial evidence.

Secondly, the accused contends regarding Charge III that, since the incident took place in Mr. Kohlstedt's apartment, the allegation that the offense occurred in a "public place" is not supported by the record. As a corollary, he maintains that, the apartment being a private place, the accused's acts therein did not constitute disorderly conduct, in that they did not affect public peace and good order. The accused equates a violation of Article 134, to wit: being drunk and disorderly under such circumstances as to bring discredit upon the military services, to the civilian offense of being drunk and disorderly in a public place. We believe that the analogy is unsound.

We concede that, depending upon the particular statute, the offense is not punishable at all in the civilian community, unless it occurs in a public place. Pugh v. State, 55 Tex Crim R 462, 117 SW 817; State v. Tincher, 21 Ind App 142, 51 NE 943. In the military, no such differentiation is made. In fact, in the military sphere, drunkenness in the privacy of one's own quarters is a punishable offense. Manual for Courts-Martial, supra, paragraph 127c, page 225; See Winthrop's Military Law and Precedents, 2 ed, 1920 Reprint, pages 722–723. However, we need not develop the full reach of the offense as it is defined in military law.

We are satisfied that drunkenness under "such circumstance as to bring discredit upon the military service" is punishable, whether it occurs in a private residence or on a public street. The gravamen of the offense is not the locus as such, but the discrediting circumstance. We think it indisputable that drunkenness by military personnel in the presence of citizens of a foreign country is discrediting to the service. Nevertheless, since the specification alleges that the accused was drunk in "a public place," we must determine whether the evidence supports this finding, which is inherent in the court's verdict. Cf. United States v. Hall, 57 BR 371, 376.

Although not developed at length, we think that the evidence reasonably shows that Mr. Kohlstedt's apartment was not a private residence, but rather a unit in a multiple-dwelling. Thus, it appears from his testimony that the door of his apartment immediately adjoined that of his neighbor, and that both apartments were located on an upper floor. The common hallway of this type of dwelling is a public place. See: People v. Richardson, 104 NYS2d 336 (NYC Mag Ct 1951). When the accused followed Mr. Kohlstedt from the apartment into the hallway, he was, at least during that time, in a public place. We conclude, therefore, that there is substantial evidence to support the finding of guilty under Charge III.

Turning now to Charge II, the question is whether Footnote 5 in the Table of Maximum Punishments limits the maximum sentence for that offense. Charge II alleges a failure to obey a general order in violation of Article 92, the maximum punishment for which is a dishonorable discharge, total forfeiture, and confinement at hard labor for two years. However, Footnote 5 provides that:

"The punishment for this offense does not apply in those cases wherein the accused is found guilty of an offense which, although involving a failure to obey a lawful order, is specifically listed elsewhere in this table."

In United States v. Thompson, 3 USCMA 620, 14 CMR 38, we held that carrying a concealed weapon is a violation of Article 134, notwithstanding

the absence of any direct regulation or order proscribing such conduct. The punishment for that offense is specifically listed in the Table of Maximum Punishments. The maximum is confinement at hard labor for three months and forfeiture of two-thirds' pay per month for three months. Manual for Courts-Martial, supra, paragraph 127c, page 227. Comparing this general offense with the provisions of the circular, the Government contends that the latter is much broader in scope, in that it prohibits the carrying of a weapon whether or not concealed. The phrase "on the person" may be susceptible of that construction, but we are of the opinion that the circular did not prohibit the carrying of weapons under all conditions, other than when engaged in authorized hunting and fishing. Military personnel frequently carry weapons, in open display, for legitimate purposes. Yet, under the Government's theory, such carrying of a weapon would constitute a violation of the circular. We disagree. Cf. United States v. Yunque-Burgos, 3 USCMA 498, 13 CMR 54. As we interpret the circular it proscribes the carrying of a weapon under conditions which are analogous to concealment. Its general purpose is to prevent the placing of "the weapon within the immediate control and reach of the accused, and where it is available for unlawful use if he so desires." People v. Persce, 204 NY 397, 97 NE 877. We conclude, therefore, that the gravamen of the offense prohibited by the circular is substantially the same as that of carrying a concealed weapon in violation of Article 134. A specific punishment is provided for the latter offense. Hence, Footnote 5 is plainly applicable. United States v. Loos, 4 USCMA 478, 16 CMR 52.

However, the Government contends that the Berlin Command is a sensitive area with special tensions resulting from multi-nation relationships. This situation, it maintains, makes Footnote 5 inapplicable. In support of its contention, it relies upon our decision in United States v. Yunque-Burgos, 3 USCMA 498, 13 CMR 54.

The Yunque-Burgos case does not help the Government. There, we called attention to the unusual military situation in Germany only for the purpose of emphasizing that the wearing of civilian clothing, prohibited by the general order violated by the accused, was "neither less than, nor closely related to" the offense of appearing in improper uniform which was listed in the Table of Maximum Punishments. We did not hold, nor did we imply, that the military situation by itself made Footnote 5 inapplicable. Here, a specific punishment is provided in the Table for the identical act interdicted by the Circular. Hence, unless some other circumstance exists which raises the order above the level of the offense specifically listed, the punishment for failing to obey the Circular must be that provided in the Table for the offense of carrying a concealed weapon. United States v. Loos, supra. We find no such special circumstance in this case.

Certainly, the accused was not given a direct personal order regarding the carrying of a concealed weapon. See United States v. Buckmiller, 1 USCMA 504, 4 CMR 96. In essence, the Circular constitutes no more than a restatement of conduct already prohibited by the Uniform Code, the punishment for which is specifically listed in the Table of Maximum Punishments. Under the provisions of Footnote 5, therefore, the maximum sentence imposable under Charge II is limited to that specified in the Table for the offense of carrying a concealed weapon.

Turning to the sentence, we find that the total confinement which can legally be imposed for the two offenses of which the accused has been convicted is only nine months. Consequently, to the extent that the sentence includes confinement in excess of that period it is illegal. Moreover, standing alone, neither of the offenses of which the accused has been convicted, authorizes the imposition of a punitive discharge. Only by considering, under the provisions of paragraph 127c, Section B, Manual for Courts-Martial, supra, the aggregate of these offenses or the evidence of previous convictions, can we approve the bad-conduct discharge included in the

sentence. Recourse to those provisions is permissive rather than mandatory, and such action requires the exercise of discretion. Both the court-martial and the board of review undoubtedly believed that Charge II was punishable by a dishonorable discharge and confinement at hard labor for two years. Under Footnote 5, the actual maximum sentence for that offense is confinement for three months, and partial forfeiture of pay. It would be unfair to the accused to affirm a maximum sentence without affording the board of review, which has discretion to determine appropriateness of sentence, the opportunity to reconsider the sentence in the light of our holding. See United States v. Blue, 3 USCMA 550, 13 CMR 106.

In view of the foregoing, we affirm the findings of guilty on Charge III. We return the record of trial to The Judge Advocate General of the Army for submission to a board of review for reconsideration of the sentence in the light of our opinion.

Judges LATIMER and BROSMAN concur.