UNITED STATES

v.

Lieutenant Colonel Shelley S. ROGERS,
United States Air Force.

ACM 32711.

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 20 Sept. 1996.

Decided 3 May 1999.

Appellate Counsel for Appellant: Frank J. Spinner (argued), Colonel Douglas H. Kohrt, and Major Robin S. Wink.

Appellate Counsel for the United States: Major Steven B. Thompson (argued), Colonel Anthony P. Dattilo, and Major Ronald A. Rodgers.

Before YOUNG, Senior Judge, SPISAK, and SCHLEGEL, Appellate Military Judges.

## OPINION OF THE COURT

YOUNG, Senior Judge:

Court members convicted the accused of conduct unbecoming an officer by engaging in an unprofessional relationship with a subordinate officer in his chain of command, and disorderly conduct of a nature to bring discredit upon the armed forces. Articles 133 and 134, UCMJ, 10 U.S.C. §§ 933, 934. He was sentenced to total forfeitures for 4 months and a reprimand. The convening authority disapproved that portion of the disorderly conduct specification alleging service-discrediting conduct, and reduced the sentence to forfeiture of $2,789 pay per month for 4 months.

Pursuant to Article 69(a), UCMJ, 10 U.S.C. § 869(a), the case was forwarded to The Judge Advocate General for review. *See* Rule for Courts–Martial (R.C.M.) 1201(b). The accused assigned several errors for review: (1) The specification alleging conduct unbecoming an officer fails to state an offense; (2) The evidence is legally insufficient to sustain the convictions; (3) The convening authority's modification of the disorderly conduct offense was unlawful; and (4) Government misconduct resulted in a violation of due process. The Judge Advocate General referred the case to this Court, pursuant to Article 69(d), UCMJ, 10 U.S.C. § 869(d), and invited our attention to an additional issue: Does the offense of engaging in an unprofessional relationship with another officer require proof of a custom of the service or a violation of a regulation prohibiting such conduct? As this question is intertwined with the legal sufficiency issue, they will be discussed together. When reviewing cases referred to us under Article 69, UCMJ, we may take action only with respect to matters of law. Article 69(e), UCMJ, 10 U.S.C. § 869(e).

## I. Failure to State an Offense

### A. Background

The specification of Charge II alleges that the accused did, "between on or about 20 November 1995 and on or about 18 December 1995, wrongfully and willfully develop an unprofessional relationship of inappropriate familiarity with First Lieutenant Julie Clemm, a subordinate under his command, which conduct under the circumstances was unbecoming an officer and a gentleman." At trial and before us, the accused asserts that the specification does not state an offense because (1) it failed to allege that the accused's conduct violated a custom of the service, and (2) it failed to identify any specific acts which amounted to displays of undue familiarity. We hold that the specification does state an offense.

### B. Law

Under the early common law, an indictment had to charge an offense with precision and technical accuracy. Failure to strictly conform to the formal pleading requirements led to dismissal of the charge. 41 Am.Jur.2d, *Indictments and Informations* § 90 (1995). The modern practice is not so strict.

> The rigor of old common-law rules of criminal pleading has yielded, in modern practice, to the general principle that formal defects, not prejudicial, will be disregarded. The true test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, "and sufficiently apprised the defendant of what he must be prepared to meet, and in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction."

*Hagner v. United States,* 285 U.S. 427, 431, 52 S.Ct. 417, 76 L.Ed. 861 (1932) (quoting *Cochran v. United States,* 157 U.S. 286, 290, 15 S.Ct. 628, 39 L.Ed. 704 (1895)). *Accord Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974).

The military is a notice-pleading jurisdiction. *See United States v. Sell,* 11 C.M.R.

202, 206, 1953 WL 2005 (C.M.A.1953) (quoting *Hagner*, 285 U.S. at 431, 52 S.Ct. 417, but without citation); *United States v. Calamita*, 48 M.J. 917, 920 n. 1 (A.F.Ct.Crim.App.1998), *pet. denied*, —— M.J. —— (1999); *United States v. Smith*, 40 C.M.R. 432, 436 (A.B.R. 1968); *United States v. Wright*, 35 C.M.R. 546, 551, 1964 WL 4964 (A.B.R.1964); *United States v. Wheeler*, 27 C.M.R. 888, 892, 1959 WL 3699 (N.B.R.1959). We have followed "the modern tendency ... toward allowing the pleading of legal conclusions and the elimination of detailed factual allegations from counts charging misconduct." *United States v. Williams*, 31 C.M.R. 269, 271, 1962 WL 4409 (C.M.A.1962). *See United States v. Alcantara*, 40 C.M.R. 84, 1969 WL 6012 (C.M.A.1969) (holding a larceny specification alleging the theft of not further described "foodstuffs" was sufficiently definite to allege an offense).

In the military, a specification informs an accused of the allegations against him. The President has defined the specification as "a plain, concise, and definite statement of the essential facts constituting the offense charged. A specification is sufficient if it alleges every element of the charged offense expressly or by necessary implication. No particular form is required." R.C.M. 307(c)(3).

The Court of Appeals for the Armed Forces has fashioned a three-pronged test for determining whether a specification states an offense. The specification must provide "(1) the essential elements of the offense, (2) notice of the charge, and (3) protection against double jeopardy." *United States v. Dear*, 40 M.J. 196, 197 (C.M.A. 1994). Because these specifications were challenged at trial, we must examine them more critically than if the challenge was first raised on appeal. *United States v. French*, 31 M.J. 57, 59 (C.M.A.1990).

### C. Discussion

The essential elements of the offense of conduct unbecoming an officer are: "(1) That the accused did or omitted to do certain acts [wrongfully and willfully develop an unprofessional relationship of inappropriate familiarity with First Lieutenant Julie Clemm,

a subordinate under his command]; and (2) That, under the circumstances, these acts or omissions constituted conduct unbecoming an officer and a gentleman." *Manual for Courts–Martial, United States (MCM)*, Part IV, ¶ 59b (1995 ed.).

The President has explained the offense of conduct unbecoming an officer under Article 133 as follows:

> Conduct violative of this article is action or behavior in an official capacity which, in dishonoring or disgracing the person as an officer, seriously compromises the officer's character as a gentleman, or action or behavior in an unofficial or private capacity which, in dishonoring or disgracing the officer personally, seriously compromises the person's standing as an officer. There are certain moral attributes common to the ideal officer and the perfect gentleman, a lack of which is indicated by acts of dishonesty, unfair dealing, indecency, indecorum, lawlessness, injustice, or cruelty. Not everyone is or can be expected to meet unrealistically high moral standards, but there is a limit of tolerance based on customs of the service and military necessity below which the personal standards of an officer ... cannot fall without seriously compromising the person's standing as an officer ... or the person's character as a gentleman. This article prohibits conduct by a commissioned officer ... which, taking all the circumstances into consideration, is thus compromising.

*MCM*, Part IV, ¶ 59(c)(2).

In applying the *Dear* test to the accused's case, it is apparent that the specification provides the accused protection against double jeopardy. The accused's conviction on the charged offense would preclude conviction for virtually any other offense alleging an unprofessional relationship with Lt Clemm during the charged period. Furthermore, because the accused may rely on his record of trial in raising a claim of double jeopardy, it is questionable whether the specification needs to be specific enough to do so alone. *Dear*, 40 M.J. at 197 (citing *United States v. Williams*, 21 M.J. 330, 332 (C.M.A. 1986)).

The accused asserts, in one assigned error, that the specification failed to state an offense because it did not allege a relevant custom or regulation which prohibits unprofessional conduct. In his brief, the accused mixes the concepts of the adequacy of the notice in the specification and the adequacy of notice in the statute. While the concepts are analogous, they are somewhat different. When examining the adequacy of Article 133, the statute, the focus is on whether one could reasonably understand that his contemplated conduct is criminal. *See Parker v. Levy*, 417 U.S. 733, 757, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (holding Article 133 is neither unconstitutionally vague nor facially invalid for overbreadth). When examining the adequacy of the notice in a specification, the focus is on whether the accused had adequate information to place him on notice of the allegation against which he must be prepared to defend. *Hagner*, 285 U.S. at 431, 52 S.Ct. 417.

The accused cites *United States v. Kroop*, 34 M.J. 628 (A.F.C.M.R.1992), *aff'd*, 38 M.J. 470 (C.M.A.1993) as support for his claim that to be valid the specification must allege a violation of a regulation or custom of the service. The government charged that Lt Colonel Kroop did "wrongfully behave with undue familiarity, wrongfully engage in excessive social contacts, and wrongfully have sexual intercourse with" a married female lieutenant under his command, "which conduct, under the circumstances, was unbecoming an officer and a gentleman."

The Air Force Court of Military Review found that the allegations of behaving with "undue familiarity" and engaging in "excessive social contacts" were akin to fraternization, and "absent a special regulatory prohibition, fraternization is only an offense in the military when it involves relations between an officer and an enlisted person that violate a custom of the service." *Id.*, 34 M.J. at 634. The Court stated that without a regulation or a long-standing custom against such familiarity and social contacts, the accused would not have adequate notice that his conduct was criminal. *Id.* (citing *Levy*, 417 U.S. at 755, 94 S.Ct. 2547). Finding no such Air Force regulation, the Court noted the difficulty in defining a custom because of the vagueness of the terms "undue familiarity" and "excessive social contacts." The Court held the specification failed to state an offense, except as it alleged adultery.

The Court of Military Appeals affirmed in a splintered opinion. Senior Judge Everett and Judge Wiss opined that the allegations would not state an offense absent an Air Force custom or regulation to the contrary. Chief Judge Sullivan concurred in sustaining the conviction for adultery, but declined to comment further. Judge Gierke dissented. He would have held that the allegations of "undue familiarity" and "excessive social contacts" were sufficient to allege violations of Article 133. Judge Cox agreed with Judge Gierke's explanation of the law, but concurred in the result. Judge Cox read the Air Force court's decision, doubting that the particular conduct charged was of such a character as to rise to conduct unbecoming an officer, as an exercise of its fact-finding powers under Article 66(c), UCMJ. As such, the Court of Military Appeals was without authority to reverse. *Kroop*, 38 M.J. at 473 (Cox, J., concurring in the result).

"Despite the high standards of accountability to which an officer is held, it still is necessary that, through custom, regulation, or otherwise, he be given notice that his conduct is unbecoming." *United States v. Guaglione*, 27 M.J. 268, 272 (C.M.A.1988). But, unlike Kroop, this accused was not charged with some vague and undefined crime. He was charged with developing an "unprofessional relationship" with a subordinate. At the time of the offense, the term "unprofessional relationships" was defined by a general regulation, Air Force Instruction (AFI) 36–2909, *Fraternization and Professional Relationships* (20 Feb 95). That regulation required that all members of the Air Force "must respect authority and maintain military customs and courtesies, which include avoiding unprofessional relationships." *Id.* at ¶ 1. It further required that Air Force personnel "be aware of the guidelines" contained therein, and "conduct their official and personal relationships accordingly." *Id.* at ¶ 1.1. The instruction defines the term "unprofessional relationships" as "[p]ersonal re-

lationships between officers, between enlisted members, and between officers and enlisted members (fraternization) which result in inappropriate familiarity or create the appearance of favoritism, preferential treatment, or impropriety." *Id.* at ¶ A1.1.3.

The instruction further explains the concept:

Professional relationships are essential to the effective operation of the Air Force, but unprofessional relationships create the appearance that personal friendships and preferences are more important than individual performance and contribution to the mission. Because they erode morale, discipline, and the unit's ability to perform its mission, they become matters of official concern.

*Id.* at ¶ A1.2.1. Dating can cause the appearance of favoritism or partiality and affect the morale, discipline, or mission accomplishment of the organization. *Id.* at ¶ A1.3.1 and A1.3.2. The instruction made the senior member primarily responsible for maintaining any relationship on a professional basis. *Id.* at ¶ 1.2. Although AFI 36–2909 does not appear to be punitive, it provides notice to military members of the meaning of the term "unprofessional relationship" and the possibility of punitive action for conducting such a relationship. *See id.* at ¶ 2.2.

The accused further argues that the prosecution was required to allege in the specification every act it intended to prove to establish the unprofessional relationship. He claims that two-thirds of the members had to agree that he committed a particular act before any member could consider it to support a conviction.

The accused was charged with a course of conduct offense—that he did wrongfully and willfully develop an unprofessional relationship of inappropriate familiarity with Lt Clemm, a subordinate under his command. The prosecution was not trying to allege that the accused committed an offense by going with Lt Clemm to the gym to exercise or to a restaurant to eat dinner. Indeed, such acts could be perfectly legal. By charging the accused with conduct unbecoming an officer, the prosecution was alleging that, taken as a whole, the accused's relationship with Lt

Clemm was unprofessional and criminal because it "[fell] below the standards established for officers." *United States v. Taylor,* 23 M.J. 314, 318 (C.M.A.1987). The acts which the accused claimed were missing from the specification were merely evidence the prosecution believed established an unprofessional and inappropriate relationship. As such, they did not amount to elements of the offense, and there was no need for the prosecution to allege them in the specification or any requirement that the members vote on them. There is no requirement that the specification plead all of the evidence that will support the accused's conviction. That is the purpose of discovery and the bill of particulars, both of which were provided to this accused. *See* R.C.M. 906(b)(6), Discussion ("The purposes of a bill of particulars are to inform the accused of the nature of the charge with sufficient precision to enable the accused to prepare for trial, to avoid or minimize the danger of surprise at the time of trial, and to enable the accused to plead the acquittal or conviction in bar of another prosecution for the same offense when the specification itself is too vague and indefinite for such purposes"). *See also* Francis A. Gilligan and Fredric I. Lederer, *Court–Martial Procedure* § 6–12.00 (1991).

We have no doubt that the express terms of Article 133, the explanations of the offense contained in the *Manual for Courts–Martial,* the provisions of AFI 36–2909, and the expressions of his subordinates to him that the relationship was inappropriate (see Part III. A.) provided adequate notice to the accused that his conduct was criminal. Furthermore, the specification alleged an offense and adequately notified the accused of the charge against which he had to defend, and the elements of that offense.

## II. Disorderly Conduct

The accused was convicted of being disorderly in a public place, a violation of Article 134, UCMJ, in that, on divers occasions, in Pordenone, Italy, he "willfully walked on top of parked automobiles belonging to others, which conduct was of a nature to bring discredit upon the armed forces." In response to the staff judge advocate's recommendation, the accused claimed that he could not be

convicted of service discrediting conduct because there was no proof the public was aware of his behavior or his military status. *United States v. Green*, 39 M.J. 606, 609 (A.C.M.R.1994). *But see United States v. Lowe*, 16 C.M.R. 228, 1954 WL 2445 (C.M.A. 1954) (holding drunkenness may be service-discrediting whether or not it occurs in public). *See also United States v. Guerrero*, 33 M.J. 295, 298 (C.M.A.1991) (if conduct not per se service-discrediting, then must examine the (1) time, (2) place, (3) circumstances, and (4) purpose, of the accused's conduct). *Cf. United States v. Carr*, 28 M.J. 661 (N.M.C.M.R.1989) (holding an act of sexual intercourse is "'open and notorious' (and hence criminal) when it is performed in such a place and under such circumstances that it is *reasonably likely to be seen by others*") (emphasis added). The convening authority, upon the recommendation of his staff judge advocate, approved the conviction of the lesser-included offense of conduct prejudicial to good order and discipline.

The accused asserts that the convening authority's action in approving a finding of guilty to conduct prejudicial to good order and discipline was unlawful because the court members never found him guilty of that element. In effect, he is arguing that a disorder to the prejudice of good order and discipline is not a lesser-included offense of a service discrediting disorder.

The military judge instructed the court members that the offense of service discrediting disorderly conduct has two elements— that the accused committed the act alleged and that, under the circumstances, the conduct was service-discrediting. The military judge also told the members that if they found the accused not guilty of a service-discrediting disorder, they should consider the lesser-included offense of a disorder to the prejudice of good order and discipline. The military judge instructed the members that the elements of this offense were that the accused committed the conduct alleged and that, under the circumstances, the conduct was prejudicial to good order and discipline.

In acting on the findings of a court-martial, the convening authority may change a find-

ing of guilty to an offense that is a lesser-included offense of the offense of which the accused was convicted. Article 60(c)(3)(B), 10 U.S.C. § 860(c)(3)(B). "A lesser offense is included in a charged offense when the specification contains allegations which either expressly or by fair implication put the accused on notice to be prepared to defend against it in addition to the offense specifically charged." *MCM*, Part IV, ¶ 3b(1).

■ In determining if one offense is a lesser-included offense of another, we must examine the statutory elements as well as the pleadings. *United States v. Weymouth*, 43 M.J. 329, 340 (1995). Conduct prejudicial to good order and discipline is a characteristic of all offenses under the Uniform Code of Military Justice, and it is presumed in all specifically enumerated offenses. *United States v. Foster*, 40 M.J. 140, 143 (C.M.A.1994) (citing *United States v. Doss*, 15 M.J. 409, 415 (C.M.A.1983) (Cook, J., concurring in the result)). While service-discrediting disorderly conduct is not an enumerated offense, we are convinced the same rule applies—the prejudice to good order and discipline element is presumed in service-discrediting conduct. Alleging a disorder as service-discrediting merely enhances the maximum period of confinement which may be imposed. Therefore, disorderly conduct to the prejudice of good order and discipline is a lesser-included offense of disorderly conduct of a nature to bring discredit upon the armed forces. The convening authority's action was a lawful exercise of his discretion.

### III. Legal Sufficiency

■ The accused asserts that the evidence presented at trial was legally insufficient to sustain either of his convictions. The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324 (C.M.A.1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). We will "draw every reasonable inference from the evidence of record in favor of the prosecution." *United*

*States v. Blocker*, 32 M.J. 281, 284 (C.M.A. 1991).

### A. Conduct Unbecoming an Officer

There are two elements to the offense of conduct unbecoming an officer: (1) that between on or about 20 November 1995 and 18 December 1995, at or near Pordenone, Italy, the accused did wrongfully and willfully develop an unprofessional relationship of inappropriate familiarity with First Lieutenant Julie Clemm, a subordinate under his command; and (2) that under the circumstances, the accused's conduct was unbecoming an officer and a gentleman. The military judge broke the first element into two, but it does not affect our decision. Conduct unbecoming an officer and a gentleman includes "action or behavior in an unofficial or private capacity which, in dishonoring or disgracing the officer personally, seriously compromises the person's standing as an officer." *MCM*, Part IV, ¶ 59c(2).

The accused was the commander of a fighter squadron deployed from Elmendorf Air Force Base (AFB), Alaska, to Aviano Air Base (AB), Italy. Lt Clemm was assigned to the accused's squadron as an intelligence officer and was also deployed to Aviano AB.

The squadron held a Thanksgiving party at the hotel in which the enlisted members of the squadron were staying. After dinner, Lt Clemm went behind the bar and started mixing drinks. She was very intoxicated and several of the enlisted members appeared to be disgusted by her behavior. Captain Lovrak, the squadron section commander, saw Lt Clemm press back against Major Cloutier, the operations officer, turn, and put her hands on his chest, while he tried to avoid her. Major Cloutier saw the accused and Lt Clemm behind the bar together, standing close together. Major Cloutier became uncomfortable because of the enlisted personnel who were in attendance. Some of the enlisted members discussed with Major Moore their concerns with Lt Clemm's behavior.

Shortly thereafter, the accused and Lt Clemm went to a squadron bonfire on the beach below the hotel. At least three officers in the squadron observed the accused place his arm around Lt Clemm, while standing with his hip touching hers. The officers became concerned about the appearance of impropriety. Captain Hughes pulled the accused away from Lt Clemm, with some difficulty, on a pretext of discussing air operations. At the end of the discussion, Captain Hughes warned the accused to stay away from Lt Clemm because of the appearance of impropriety. The accused and Captain Hughes returned to the bonfire. Major Durtschi, another member of the squadron, observed the accused return to the bonfire, stand very close to Lt Clemm, and again put his arm around her.

When the group departed the beach to return to their hotel, the accused and Lt Clemm started to get into the back seat of a vehicle together. Captain Lange, concerned about the behavior on the beach, tried to sit between them, but was shunted to another vehicle. During the ride back to the hotel, the accused placed his hand on top of Lt Clemm's hand. The next day the accused apologized for touching her or being forward with her.

When the group arrived back at the hotel, Captain Hughes rode up the elevator with the accused and warned him about going to see Lt Clemm. The accused responded, "Yeah, but she would look really good with my dick in her mouth." When the accused got back to his room, he called Lt Clemm. She was in Major Cloutier's room (across the hall from her room) when the phone rang. She told him there was a party going on in Major Cloutier's room and that he should come downstairs (the accused lived on a higher floor). Approximately five minutes later, the accused arrived with two glasses and a bottle of wine. He sat close to Lt Clemm and shared the wine exclusively with her. The accused and Lt Clemm left the party within minutes of each other.

Several officers in the squadron believed the accused and Lt Clemm spent an inordinate amount of time together. They seemed to travel back and forth between the hotel and the squadron together on a regular basis. They went to the gym and ate at restaurants together.

Lt Clemm signed up to go on a trip to Rome. The accused was scheduled to go to Rome the same weekend, but not as part of

the tour. Both Lt Clemm and the accused cancelled their trips. During that weekend, the accused had two telephone conversations with Captain Hume, in which he said he was up in the mountains with a beautiful woman. Lt Clemm was not seen all weekend, but claimed to have stayed in her room. Major Cloutier knocked on Lt Clemm's door on Saturday night and Sunday morning, but did not get a response.

After the accused's impromptu promotion party, at approximately 0300, Major Grahn, another member of the squadron, confronted the accused about the appearance that he was having an inappropriate relationship with Lt Clemm. The accused did not deny it. During their conversation, Lt Clemm telephoned the accused.

As Captain Lovrak explained, the accused was familiar with his responsibilities as a leader.

He discussed how one's—the perceptions of other people of our personal conduct, can affect a leader's effectiveness or ineffectiveness, stating specifically that when a leader is seen or even perceived to fail morally, then that leader has indeed failed, because perception is reality in this business. And that when confronted on perceptions regarding one's personal conduct, it is that leader's responsibility to change that perception by changing the conduct, regardless of the validity or invalidity of the actions driving those perceptions.

The accused told Captain Lovrak that his wife had planned to meet him in Hawaii for a romantic rendezvous before he returned to Elmendorf AFB. During the planning for the return, the accused told Captain Lovrak that he didn't want to go. Although he missed his wife and child, he was having too much fun.

On the flight back to Elmendorf AFB after he was relieved of command, the accused told Major Moore that Lt Clemm had had affairs in the past, including one with Major Cloutier. He said that "he didn't know how deep he and [his wife] would have to go to right this or to—how deep he would have to dig into the squadron affairs." He also said that "this may be 'me and Julie against the whole Air Force by the time it's all over,'" and the results would be "earth-shattering."

Several subordinate officers warned the accused of the perception that he was carrying on an affair with Lt Clemm. The accused took no action to change his behavior or alleviate the concerns of his subordinates.

Considering the evidence in the light most favorable to the prosecution and drawing every reasonable inference in favor of the prosecution, we are convinced that a reasonable fact-finder could have found, beyond a reasonable doubt, that the accused did wrongfully and willfully develop an unprofessional relationship with Lt Clemm which, under the circumstances, was unbecoming an officer and a gentleman because it fell below the standards established for Air Force officers.

■ In reaching this conclusion, we considered the issue invited by The Judge Advocate General: Does the offense of engaging in an unprofessional relationship with another officer require proof of a custom of the service or a violation of a regulation prohibiting such conduct? It does not. The prosecution is required to prove beyond a reasonable doubt each and every element of the offense charged. As noted earlier, the existence of a custom or regulation prohibiting the accused's conduct is not an element of the offense. Article 133 was not meant to be so restrictive. The gravamen of an offense under Article 133, is not that the conduct violates a custom of the service or a regulation, but that, as a whole, it falls below the level of conduct we expect of our officers. *MCM*, Part IV, ¶ 59c(2). A regulation or custom would be admissible to show that his conduct fell below the appropriate level, but would not be necessary. It is for the members to determine, under all the circumstances of the case, whether the accused's conduct fell below the acceptable level.

### B. Disorderly Conduct

■ There are two elements to the offense of disorderly conduct: (1) that the accused was disorderly by walking on cars; and (2) that, under the circumstances, the accused's conduct was prejudicial to good order and discipline. *See MCM*, Part IV, ¶ 73b. The definition of disorderly conduct includes, "conduct of such a nature as to affect the peace and quiet of persons who *may* witness

it and who *may* be disturbed or provoked to resentment thereby." *MCM*, Part IV, ¶ 73c(2) (emphasis added). To be prejudicial to good order and discipline, the conduct must be prejudicial in a reasonably direct and palpable manner. *Id.* at ¶ 60c(2)(a).

The evidence established that on more than one occasion, in the city streets of Pordenone, Italy, the accused walked on the cars of others that were parked along the street. On each of these occasions he did so in the presence of subordinates under his command. On the last occasion, which occurred after an impromptu promotion party, the accused had to be restrained by an officer under his command who observed damage to the vehicles. Considering the evidence in the light most favorable to the prosecution and drawing every reasonable inference in favor of the prosecution, we are convinced that a reasonable fact-finder could have found, beyond a reasonable doubt, that the accused was disorderly and that his conduct was prejudicial to good order and discipline in a direct and palpable manner.

### IV. Government Misconduct

In his last assignment of error, the accused alleges that government misconduct so permeated his court-martial as to deny him due process of law. He provides a laundry list of abuses, some of which were resolved by the government prior to trial, some were resolved by the military judge at trial, others were never raised at trial despite the opportunity to do so, and several focus on the government's treatment of Lt Clemm, for which the accused admits he had no standing to contest. After examining these issues, we are convinced that the accused has failed to carry his burden of establishing that the government's conduct was outrageous or that he was prejudiced by it.

### V. Conclusion

Finding no error of law, the findings and sentence are

AFFIRMED.

Judge SPISAK and Judge SCHLEGEL concur.