# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39978 (f rev)**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Drake E. TAYLOR**
Captain (O-3), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

*Upon Further Review*

Decided 30 March 2022

———————————

*Military Judge:* Mark W. Milam; Andrew R. Norton (remand).

*Sentence:* Sentence adjudged on 23 June 2020 by GCM convened at Aviano Air Base, Italy. Sentence entered by military judge on 15 September 2020 and reentered on 7 June 2021: Dismissal, confinement for 60 days, forfeiture of $1,500.00 pay per month for 3 months, and a reprimand.

*For Appellant:* None.[1]

*For Appellee*: Major Alex B. Coberly, USAF; Major Jessica L. Delaney, USAF; Ms. Mary Ellen Payne, Esquire.

Before JOHNSON, KEY, and ANNEXSTAD, *Appellate Military Judges*.

Senior Judge KEY delivered the opinion of the court, in which Chief Judge JOHNSON and Judge ANNEXSTAD joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

---

[1] Appellant declined appellate defense counsel representation.

KEY, Senior Judge:

A military judge sitting as a general court-martial convicted Appellant, in accordance with his pleas pursuant to a plea agreement, of five specifications of conduct unbecoming an officer in violation of Article 133, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 933, and two specifications of fraternization and three specifications of adultery in violation of Article 134, UCMJ, 10 U.S.C. § 934.[2,3] The military judge sentenced Appellant to a dismissal, confinement for 60 days, forfeiture of $1,500.00 pay per month for three months, and a reprimand.[4]

Appellant's case was originally considered without any assignments of error. In that review, the court determined the convening authority had failed to take action on the sentence as required by Executive Order 13,825, § 6(b), 83 Fed. Reg. 9889, 9890 (8 Mar. 2018), and Article 60, UCMJ, 10 U.S.C. § 860 (*Manual for Courts-Martial*, *United States* (2016 ed.)), and we remanded Appellant's case to the Chief Trial Judge, Air Force Trial Judiciary, for corrective action. *See United States v. Taylor*, No. ACM 39978, 2021 CCA LEXIS 228, at *8–9 (A.F. Ct. Crim. App. 13 May 2021) (unpub. op.). The convening authority subsequently approved Appellant's sentence, resulting in a new entry of judgment, and Appellant's case was redocketed on 9 June 2021. We ordered the Government to show cause why we should not return the record for the correction of certain matters, and the Government responded to that order on 9 July 2021, as discussed further in Section II(D), *infra*.

---

[2] References to the punitive articles of the UCMJ are to the *Manual for Courts-Martial*, *United States* (2016 ed.). Unless otherwise specified, all other references to the UCMJ and the Rules for Courts-Martial are to the *Manual for Courts-Martial*, *United States* (2019 ed.).

[3] Pursuant to the terms of the plea agreement, the convening authority withdrew and dismissed with prejudice one charge and its specification of making a false official statement in violation of Article 107, UCMJ, 10 U.S.C. § 907, and one specification of conduct unbecoming an officer in violation of Article 133, UCMJ, 10 U.S.C. § 933, after Appellant had been arraigned.

[4] By virtue of being charged with offenses committed both before and after 1 January 2019, Appellant had the option—which he exercised—to be sentenced under the sentencing rules in effect on 1 January 2019 pursuant to R.C.M. 902A, *Manual for Courts-Martial, United States* (2019 ed.). The military judge sentenced Appellant to separate terms of confinement for each specification, ranging from no confinement to 60 days. In conformity with the plea agreement, the military judge specified the terms would run concurrently.

In the interim, on 29 June 2021, Appellant submitted assignments of error. Now that the error regarding convening authority action has been corrected, we turn to the issues Appellant raises on appeal: (1) whether he received ineffective assistance of counsel; (2) whether his pleas were provident; and (3) whether his sentence is inappropriately severe.[5] Although not raised by Appellant, we also consider whether his record is incomplete and whether the convening authority took appropriate action on Appellant's deferment request. Finding no error prejudicial to the substantial rights of Appellant in the case as returned to us, we affirm the findings and sentence.

## I. BACKGROUND

Appellant's offenses largely arose from his inappropriate relationships with various women and his attempts to impede the investigation into his misconduct.

Appellant initially enlisted in the Air Force in 2005. After that enlistment expired, Appellant went to college, joined the Reserve Officer Training Corps, majored in criminal justice, and was commissioned as an officer in 2013 and assigned to serve as a security forces officer. In 2016, Appellant—then a first lieutenant—reported to Aviano Air Base, Italy, where he was a flight commander in the security forces squadron. In that position, he was responsible for the law enforcement desk, among other duties.

Shortly after he arrived, and while still living in temporary base housing, Appellant met two enlisted servicemembers and their families. The first family consisted of Technical Sergeant (TSgt) JW, his wife Ms. MW, and their children.[6] The second family was comprised of TSgt TG, his wife Ms. BG, and their children. Appellant was a single father with custody of his daughter. The three families moved into homes in the same cul-de-sac with Appellant living in one unit of a duplex while TSgt TG's family lived in the other unit. TSgt TG was assigned to the same security forces squadron as Appellant, and the three families would routinely get together for meals and to socialize. TSgt JW and Ms. MW would also watch Appellant's daughter from time to time for Appellant.

In the spring of 2017, Appellant met Airman First Class (A1C) JH, a servicemember assigned to Appellant's flight and under his command. Appellant

---

[5] Appellant's assignments of error were not presented in the format typically used by counsel who practice before this court. Recognizing Appellant is appearing *pro se*, we have consolidated and reframed his claims.

[6] By the time of Appellant's court-martial, Technical Sergeant JW had been promoted to the grade of master sergeant. We use his grade at the time of Appellant's misconduct for consistency.

subsequently befriended A1C JH and invited her to his house on two occasions, invitations she accepted. Both times, Appellant engaged in sexual intercourse with A1C JH. During this same timeframe, Appellant engaged in sexual activity with Ms. MW and had sexual intercourse with her in June 2017.

Appellant was deployed to another country from approximately July 2017 to January 2018. During this deployment, Ms. MW and Ms. BG sent Appellant sexually explicit messages and suggestive photographs, and Appellant sent the women a video of him masturbating.[7] Upon his return, Appellant was made the officer in charge of the division TSgt TG was assigned to. Also upon his return, Appellant began a sexual relationship with Staff Sergeant (SSgt) JC, another security forces squadron member. SSgt JC's husband—an enlisted servicemember—was deployed at the time. One of SSgt JC's subordinate Airmen was aware of their sexual relationship and observed Appellant exhibiting favoritism towards SSgt JC.

Meanwhile, Appellant grew closer to Ms. MW and Ms. BG, with the two women telling Appellant about difficulties in their marriages. Both TSgt TG and TSgt JW were deployed at the time, and Appellant engaged in sexual activity, to include sexual intercourse, with both women. Twice after Appellant returned from his deployment, the three engaged in sexual activity together. In March 2018, Appellant and Ms. BG ceased sexual contact, but Appellant continued his sexual relationship with Ms. MW. In the late summer of 2018, Ms. MW and Appellant took a trip together to Venice, Italy, where they acquired matching tattoos consisting of the lyrics from "their song."

On one occasion during the summer of 2018, Appellant went to a club with Ms. MW and Ms. BG to celebrate the birthday of another woman who was married to a deployed, enlisted servicemember. While at the club, Appellant performed a "lap dance" on this woman for several minutes while Ms. MW recorded a portion of the dance on her phone. Appellant knew the woman's husband was enlisted and deployed at the time.

In October 2018, TSgt JW and Ms. MW took a trip together to the Netherlands. While there, TSgt JW confronted Ms. MW about her repeatedly sending messages to Appellant, and Ms. MW confessed to her husband that she and Appellant had a sexual relationship. In the aftermath of this revelation, Ms. MW blocked Appellant from her social media accounts. A month or two later, TSgt JW reported Appellant's affair with his wife and an investigation ensued.

---

[7] Initially, Ms. MW was unaware that Appellant was sending suggestive messages to Ms. BG, and *vice versa*. At some point, Ms. MW and Ms. BG learned they were both receiving such messages, causing a rift between them. Once they mended their friendship, all three began sending suggestive messages to each other.

Appellant learned he was under investigation, and he told Ms. BG via text message to "play dumb," deny any knowledge of the sexual relationship between him and Ms. MW if she was asked about it, and to "delete these messages." Appellant also told Ms. BG to tell Ms. MW that she (Ms. MW) should tell investigators that she and Appellant were merely "really good friends" and assert her Fifth Amendment[8] rights if questioned further. Additionally, Appellant sent a message to SSgt JC, telling her to "not say anything" if questioned by investigators.[9]

Appellant largely stipulated to all of the foregoing. During his providence inquiry at his court-martial, Appellant disagreed that he told SSgt JC "not to say anything," but he admitted she could have inferred as much from Appellant asking her if she was sure she had not "said anything to anybody." SSgt JC said she had not, and Appellant responded, "[O]kay, I trust you." Appellant told the military judge that by saying, "I trust you," he "was expressing that [he] did not want her to say anything by that statement." Appellant further agreed with questions posed by the military judge that he was "trying to instruct or direct [SSgt JC] not to talk to [the investigators]."

Ultimately, Appellant was convicted, pursuant to his pleas, of fraternizing with SSgt JC and A1C JH and committing adultery with SSgt JC, Ms. MW, and Ms. BG. He was also convicted of conduct unbecoming an officer for: carrying on intimate relationships with enlisted servicemembers' spouses; the lap dance; and endeavoring to impede the investigation by asking SSgt JC, Ms. MW, and Ms. BG to withhold information from or otherwise mislead investigators.

During presentencing proceedings, the Government called TSgt JW, Ms. MW, TSgt TG, and Ms. BG to testify. SSgt JC submitted an unsworn written statement under R.C.M. 1001(c). TSgt JW testified that he and Appellant had viewed each other as "best friends" and TSgt JW thought of Appellant as a mentor. Once he learned of his wife's affair with Appellant, TSgt JW said he found it difficult to figure out whom he could trust, and that it had negatively impacted his duty performance. TSgt JW also recounted an incident after the investigation began, but before Appellant's court-martial, when TSgt JW saw Appellant outside and in uniform. Not wanting to salute Appellant, TSgt JW attempted to walk away. Appellant, however, turned and looked at TSgt JW and then saluted TSgt JW, saying, "Good morning, Sergeant [W]." TSgt JW admitted he "lost [his] military bearing" and told Appellant he "can burn in

---

[8] U.S. CONST. amend. V.

[9] SSgt JC had separated from the military a few months prior to this message. We refer to her by her rank for consistency.

hell for what [he had] done." According to TSgt JW, Appellant just smiled and said, "Good morning, Sergeant [W]" again. Ms. MW testified that she saw TSgt JW become "numb" after the affair was revealed and said he would not talk much to his family. Appellant stipulated that when TSgt JW found out about Appellant's conduct, he "was angry and struggled to stay focused on his mission . . . ."

Ms. MW also testified that her relationship with Appellant impacted her marriage "quite a lot," because she was so emotionally attached to Appellant that when TSgt JW came back from his deployment, TSgt JW "didn't really have a chance." Ms. MW said, however, that her relationship with Appellant was not the "sole reason" her marriage fell apart, but once she developed feelings for Appellant it was "not possible" that she would stay with TSgt JW. On cross-examination, trial defense counsel committed Ms. MW to her testimony that Appellant was not the only reason that she was divorcing TSgt JW and that her marriage had "phases" of difficulties.

TSgt TG, who was Ms. BG's husband and a subordinate of Appellant's when he learned of Appellant's conduct, testified that he had trouble focusing at work and moved out of his house for several weeks. Ms. BG testified that when TSgt TG found out, he was "depressed," cried a lot, would not interact with his children like he had before, and had "issues at work." Appellant stipulated that his conduct with Ms. BG "caused controversy in the [security forces] unit, affected TSgt [TG's] ability to focus on his duties . . . , and eroded unit cohesion."

In her unsworn statement, SSgt JC said she felt manipulated by Appellant, describing him as consistently lying to her and taking advantage of her "for his own personal gain."

Appellant delivered an unsworn statement in a question-and-answer format with his trial defense counsel. During this statement, Appellant acknowledged he "did not set boundaries that [he] needed to when [he] befriended" TSgt JW, TSgt TG, and their wives. He said he "failed unequivocally in every aspect of trying to set boundaries and not following through on having those boundaries maintained." With respect to SSgt JC and A1C JH, Appellant said he "did not respect boundaries that should have been there, that are there, and they are there for a good reason, so things of this nature cannot happen." He described himself as "a weak individual" for "allow[ing] that to happen."

## II. DISCUSSION

### A. Ineffective Assistance of Counsel

#### 1. Additional Background

Appellant asserts his defense counsel was ineffective. Specifically, he alleges that "[w]hen agreeing to the plea deal," his trial defense counsel told him "that because [his] crimes were of solely military nature that [they] would not follow [him] outside of the military. That outside of a bad conduct discharge everything would stay with [Appellant]." Appellant further alleges his counsel "did not clarify that [he] would be classified as a [f]elon." Appellant asserts his counsel advised him to enter into a plea agreement "[w]ithout explaining that a General Court[-]Martial was the equivalent to a [c]ivilian [f]elony conviction because [he] was only facing military crimes and that there were not the equivalent in the civilian sector it would not affect [him] criminally."[10] Appellant did not submit a declaration or affidavit to this effect.

Appellant also argues his trial defense counsel was "wanting to convict and needing to convict." In support of this contention, he points to his plea of guilty to the specification alleging conduct unbecoming an officer under Article 133, UCMJ, regarding the lap dance. In this specification, Appellant was charged with performing the dance "in front of numerous other enlisted Airman [sic] and their spouses." During his providence inquiry, trial defense counsel told the Government that Appellant did not agree other enlisted Airmen were present, just spouses. After discussing the matter with the convening authority, the Government asked the military judge to except out the reference to enlisted Airmen. This led to the military judge proposing to substitute the language of "spouses of enlisted Airmen" to describe who witnessed the dance. The Defense agreed with this modification, and Appellant went on to describe the dance to the military judge and why he believed he was guilty of the offense. Notably, the stipulation of fact Appellant signed says nothing about enlisted members witnessing the dance.

Appellant also seems to argue that his trial defense counsel did not adequately confront Ms. MW during her testimony at his court-martial. Although he does not precisely state this allegation, he points to the fact Ms. MW testified that her relationship with Appellant affected her marriage. He claims trial defense counsel "never brought [text messages] to court" showing: that Ms. MW had told another servicemember that she was separated from TSgt JW; and "her apologizing to [the servicemember] for . . . threat[en]ing to assault him." In support of this point on appeal, Appellant submitted text messages

---

[10] Unless otherwise indicated, we quote Appellant verbatim and have not corrected grammatical or other errors.

apparently between Ms. MW and an unknown individual from late July 2018, when Appellant and Ms. MW were in the midst of their sexual relationship. In the messages, Ms. MW explains that she and TSgt JW had been together for 17 years, but had "been separated for almost three months now." The two also discussed some incident at a party for which the other person sought to apologize. Ms. MW responded, "Omg!!!! No it's not your fault, don't make me punch you!!!!!!!!" (followed by four laughing/crying emojis).

### 2. Law

The Sixth Amendment to the United States Constitution[11] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). We review claims of ineffective assistance of counsel de novo. *United States v. Perez*, 64 M.J. 239, 243 (C.A.A.F. 2006) (citation omitted).

An appellant "must surmount a very high hurdle" to successfully assert ineffective assistance of counsel. *Id.* (quoting *United States v. Alves*, 53 M.J. 286, 289 (C.A.A.F. 2000)). Pursuant to *Strickland v. Washington*, 466 U.S. 668, 687 (1984), Appellant has the burden of demonstrating:

> (1) a deficiency in counsel's performance that is so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment; and (2) that the deficient performance prejudiced the defense through errors so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable.

*United States v. Tippit*, 65 M.J. 69, 76 (C.A.A.F. 2007) (citations and internal quotation marks omitted).

We employ a presumption of competence, and we apply a three-part test in assessing whether that presumption has been overcome: (1) "is there a reasonable explanation for counsel's actions?;" (2) "did defense counsel's level of advocacy fall measurably below the performance . . . [ordinarily expected] of fallible lawyers?;" and (3) "if defense counsel was ineffective, is there a reasonable probability that, absent the errors, there would have been a different result?" *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (omission and alteration in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

In the face of a guilty plea, an appellant must also "show specifically that 'there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *Alves*, 53 M.J. at 289 (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).

---

[11] U.S. CONST. amend. VI.

### 3. Analysis

#### a. The Meaning of Appellant's Conviction

We need not determine whether or not trial defense counsel failed to explain that Appellant's court-martial conviction would follow him into the "civilian sector," because Appellant does not claim that if he had known this, he would have pleaded not guilty. Because he does not make this claim, Appellant has not alleged a basis for relief. *See Alves*, 53 M.J. at 289.

We note Appellant suggests that he pleaded guilty even though he believed he was "innocent." We find this suggestion somewhat implausible. Appellant entered into a detailed, single-spaced, eight-page stipulation of fact with the Government in which he meticulously detailed his offenses. The military judge asked Appellant if he was pleading guilty because he was convinced that he was, in fact, guilty, and Appellant said he was. Both Ms. MW and Ms. BG testified about their relationships with Appellant, and their respective husbands testified about how their marriages were impacted as a result. The Government further supported its case with text messages between Appellant and the women, photographs of Appellant's and Ms. MW's matching tattoos, and a video of the lap dance. Thus, Appellant faced a strong government case with little apparent ability to meaningfully challenge his charges. Even on appeal, Appellant does not claim he did not commit the offenses—rather, he disputes the degree of impact his offenses had on the military.

We find Appellant's situation similar to the petitioner's in *Hill*. In that case, the petitioner pleaded guilty after signing a "plea statement" in which he affirmed, *inter alia*, that he was satisfied with his attorney's advice and was pleading guilty because he was, in fact, guilty. 474 U.S. at 54. Because the petitioner had a prior offense on his record, he would have to serve at least half of his sentence before being eligible for parole, as opposed to a third, which would have been the case if the petitioner did not have the prior offense. *Id.* at 53. The trial judge erroneously told the petitioner he could be eligible for parole after serving just one-third of his sentence, and the petitioner later claimed in a habeas corpus petition that his attorney had given him the same erroneous advice.[12] *Id.* at 54–55. The United States Supreme Court declined to grant the petitioner relief, finding he had failed to establish prejudice for two reasons. First, the petitioner had not claimed he would have pleaded not guilty had he been correctly informed about his parole eligibility. *Id.* at 60. Second, the petitioner had not alleged any "special circumstances" that indicated he "placed

---

[12] The plea statement signed by the petitioner had a space to indicate the number of prior convictions he had; the space had a zero written in it. *Hill*, 474 U.S. at 61 (White, J., concurring).

particular emphasis" on the matter in deciding how to plead. *Id.* On that second point, the Court noted the consideration of parole eligibility would have been the same had the petitioner been convicted after pleading not guilty. *Id.*

As in *Hill*, Appellant has not claimed he would have pleaded not guilty had he been aware of how his court-martial conviction would be seen by others. Nor does he allege he placed any particular emphasis on this point when deciding how to plead. Further, how the conviction would be perceived would have been the same upon Appellant's conviction—regardless of how he pleaded. Beyond Appellant's failure to allege adequate prejudice to warrant relief, we note he told the military judge he understood the meaning, effect, and consequences of his guilty plea. Moreover, we are skeptical of Appellant's claim that he was surprised to learn his court-martial conviction would be recognized in the civilian sector in light of his criminal justice degree, his prior enlisted service, his participation in the Reserve Officer Training Corps, and the fact his officer service was in military law enforcement.

We considered whether to order a hearing to determine whether Appellant's trial defense counsel had, in fact, given Appellant erroneous advice about the impact of a court-martial conviction. Because Appellant failed to allege prejudice which could amount to a finding of ineffective assistance of counsel, we have concluded a hearing is unnecessary. *See United States v. Ginn*, 47 M.J. 236, 244 (C.A.A.F. 1997) (post-trial hearing not required when the record demonstrates an appellant is not entitled to relief). For the same reason, we decline to grant Appellant's request that we set aside the findings in his case.

### b. Confrontation of Ms. MW

To the extent Appellant alleges his trial defense counsel was ineffective in not challenging Ms. MW's testimony, we disagree. While Ms. MW credited her relationship with Appellant as affecting her marriage "quite a lot," she acknowledged that her relationship with him was not the "sole reason" for the dissolution of her marriage to TSgt JW. Conceptually, the fact Ms. MW told another person she had been separated from TSgt JW for three months might have some relevance to the actual impact Appellant had on their marriage or the extent to which his conduct was unbecoming or prejudicial to good order and discipline. Any such relevance, however, is sharply diminished by the fact Appellant and Ms. MW began their sexual relationship well before this three-month period would have started. Further, we see no path trial defense counsel could have traveled that would have permitted him to credibly allege Ms. MW had threatened to assault anyone based upon her joking "don't make me punch you" text which included laughing/crying emojis. The only realistic outcome of accusing Ms. MW of threatening the unidentified person would have been a diminution of trial defense counsel's credibility before the factfinder. Even if

Ms. MW had actually threatened some other person, Appellant has not explained how exposing such a fact would have been at all beneficial to his case.

In the end, Ms. MW's testimony was relatively tepid and altogether predictable: her extra-marital affair with Appellant had a negative impact on both TSgt JW and her marriage. Appellant's counsel was not ineffective by not trying to undermine her credibility with the implausible inferences Appellant draws from the text message exchange.

## B. Providency of Appellant's Guilty Pleas

Appellant suggests on appeal that his guilty pleas were improvident. In his assignments of error, he writes: "Having served 15 year in the military I've seen things that many people know but will not admit to. The fact that these things happened throughout the investigation and trial. Allowed for me to plead guilty even when I believed I was innocent."

### 1. Additional Background

#### a. Fraternization

Appellant contends he cannot be convicted of fraternization unless he was acting in an official capacity at the time.[13] He argues that none of the witnesses provided any testimony that his conduct involved his official capacity save one person, Senior Airman (SrA) LM, whom Appellant dismisses as having "a grudge" against him.

At his court-martial, however, Appellant stipulated that he would come by SSgt JC's desk on a weekly basis, and SrA LM—who worked alongside SSgt JC—"noticed how close [Appellant] was to SSgt [JC]. . . . [A]nd she felt uncomfortable by [Appellant's] and SSgt [JC's] close relationship." During this time frame, Appellant was carrying on a sexual relationship with SSgt JC, whose military husband was deployed.

A1C JH, meanwhile, was under Appellant's command when he was engaging in sexual intercourse with her, and Appellant stipulated to this fact.

#### b. Conduct Unbecoming an Officer and Adultery

Appellant claims he never told Ms. MW to lie; instead, he told her to "[p]lead the [Fifth] because [he] did not want her compromised for things she

---

[13] For this proposition, Appellant cites Air Force Instruction 36-2909, *Air Force Professional Relationships and Conduct* (14 Nov. 2019). Contrary to Appellant's claims, Paragraph 3.1.1 of that instruction plainly notes that the custom of the service prohibiting fraternization "recognizes that officers will not form personal relationships with enlisted members on terms of military equality, *whether on or off duty*." (Emphasis added). In any event, Appellant was not charged with violating this instruction.

had also done." Appellant references a photograph of a gift Ms. MW gave Appellant, but we are unable to identify any photograph meeting this description in the documents he submitted. He explains, however, that the gift is based upon the "intimate knowledge [they] have of each other['s] 'crimes.'"

Appellant points to various examples of others' conduct, apparently in an effort to demonstrate either that they have poor credibility or that the investigation was less than thorough. For example, he highlights that Ms. MW did not disclose the extent of her relationship with Appellant when she was first interviewed by investigators; that Ms. BG and Ms. MW rang Appellant's doorbell and ran off, apparently in violation of a no-contact order; that three witnesses were outside laughing and drinking during a period of quarantine; that Appellant experienced a rash of flat tires during the investigation; that he was not ordered to move out of his house (and away from TSgt JW's and TSgt TG's families) while awaiting his court-martial; and that TSgt JW and TSgt TG were biased against him.

To support the above, Appellant submitted several documents to this court. The first consists of text messages Appellant sent to his commander explaining that Appellant had suffered a number of flat tires. Appellant sent his commander a picture of a screw embedded in a tire and wrote, "Just letting you know for your situational awareness and to document." Appellant did not accuse anyone in particular of being responsible for the flat tires.

Appellant also submitted what he contends are online messages between TSgt JW and Appellant's fiancée.[14] The messages are undated and depict TSgt JW saying that Appellant is—in his view—"literally the worst kind of person maybe the worst person on this planet" and "the worst person to ever walk this earth." TSgt JW further writes that he "would [choose] Hitler over [Appellant] to be [his] friend," and that Appellant would not "get away with" what he had done. He added that he thought Appellant's fiancée deserved better, but that she should do whatever she thinks is right.

Finally, Appellant submitted an email apparently from Ms. MW to Appellant dated 13 May 2021, nearly a year after his court-martial. In the email, Ms. MW apologizes "for the betrayal," writing: "I don't care what you did wrong, I am not here to judge I'm just sorry I couldn't stand by my words. . . . I remember numerous times reassuring you I'd never tell."[15]

---

[14] At some point prior to the court-martial, Appellant and a local civilian woman became engaged.

[15] In her testimony at Appellant's court-martial, Ms. MW explained, "So [Appellant] and I always agreed that what happened between us would always kind of stay[ ] between us and we would take it to our grave."

Appellant further argues that his conduct had minimal impact on his unit, noting that his commander did not testify. Appellant, however, stipulated at his court-martial that both TSgt JW and TSgt TG struggled to focus on their duties when they learned of Appellant's sexual relationship with their wives. Appellant also stipulated that his conduct "caused controversy" in the unit "and eroded unit cohesion."

**2. Law**

We review a military judge's decision to accept a guilty plea for an abuse of discretion. *United States v. Riley*, 72 M.J. 115, 119 (C.A.A.F. 2013) (citing *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008)). A military judge may only accept a guilty plea after first ensuring there is a factual basis for that plea. Rule for Courts-Martial (R.C.M.) 910(e); *United States v. Care*, 40 C.M.R. 247, 253 (C.M.A. 1969). A military judge abuses his or her discretion by accepting a guilty plea "without an actual factual basis to support it." *United States v. Price*, 76 M.J. 136, 138 (C.A.A.F. 2017) (citing *United States v. Weeks*, 71 M.J. 44, 46 (C.A.A.F. 2012)). We conduct this analysis by considering Appellant's providence inquiry and the stipulated facts and ask whether his pleas have "a substantial basis in law and fact." *United States v. Hiser*, ___ M.J. ___, No. 21-0219, 2022 CAAF LEXIS 40, at *12–13 (C.A.A.F. 13 Jan. 2022). Ordinarily, we may not consider matters outside the record in assessing the providence of an appellant's pleas. *See United States v. Jessie*, 79 M.J. 437, 444–45 (C.A.A.F. 2020) (restricting the consideration of matters outside the record to issues of post-trial punishment when a challenge to the plea providence was also raised).

**3. Analysis**

***a. Fraternization***

Appellant was convicted of two specifications of fraternization under Article 134, UCMJ. These two specifications pertained to SSgt JC and A1C JH, two enlisted servicemembers with whom Appellant admitted he had sexual intercourse. Had Appellant pleaded not guilty, the Government would have had to prove beyond a reasonable doubt that: (1) Appellant was a commissioned officer; (2) he fraternized on terms of military equality with enlisted members; (3) he knew they were enlisted; (4) the conduct violated the custom of the service that Appellant not fraternize with enlisted members; and (5) the conduct was prejudicial to good order and discipline. *See Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), pt. IV, ¶ 83.b. Private and consensual sexual activity between an officer and an enlisted member may be charged as fraternization. *See, e.g., United States v. Timsuren*, 72 M.J. 823, 827 (A.F. Ct. Crim. App. 2013) (finding the act of "[s]exual intercourse was merely the means by which [the] inappropriate relationship [was] completed").

Both in his stipulation and his providence inquiry, Appellant admitted he had sexual intercourse with SSgt JC and A1C JH when he knew that they were both enlisted. Indeed, Appellant admitted to meeting both of them in their respective duty sections because he had official duties to carry out with them. Appellant admitted his conduct violated the custom of the service and that his conduct was prejudicial to good order and discipline. In explaining this to the military judge, Appellant said that his conduct could lead to enlisted members "almost disregard[ing] the entire rank structure" which could "take away from the legitimacy of the rank." Moreover, Appellant conceded the fact that SSgt JC's husband was deployed at the time when he learned of his wife's affair further prejudiced good order and discipline.

Contrary to Appellant's claims on appeal, the offense of fraternization does not require proof of on-duty conduct or inappropriate behavior in the workplace. Even if it did, Appellant stipulated that his relationship with SSgt JC was observed by at least one other Airman in her duty section. A1C JH, meanwhile, fell under Appellant's command. The prejudice to good order and discipline caused by Appellant—a superior officer having sexual relations with SSgt JC while her active-duty husband was deployed—is not only obvious, but was squarely conceded by Appellant. We see no basis for finding his fraternization pleas improvident.

### b. Conduct Unbecoming an Officer

Appellant was convicted of five specifications of conduct unbecoming an officer under Article 133, UCMJ, for: developing "wrongful intimate relationships" with Ms. MW and Ms. BG; performing the lap dance; and trying to convince SSgt JC, Ms. MW, and Ms. BG to help him impede the investigation. Thus, the Government was required to prove Appellant engaged in the alleged conduct and that the conduct "under the circumstances . . . constituted conduct unbecoming an officer and gentleman." *See* 2016 *MCM*, pt. IV, ¶ 59.b. Such conduct may be in an official capacity or "in an unofficial or private capacity which, in dishonoring or disgracing the officer personally, seriously compromises the person's standing as an officer." 2016 *MCM*, pt. IV, ¶ 59.c.(2). Even when such conduct may be charged under another article of the UCMJ, it is punishable under Article 133 so long as the conduct amounts to that which is unbecoming an officer and a gentleman. *Id.* In such cases, the elements of proof comprise that of the other article with the additional "conduct unbecoming" element. *Id.*

But for Appellant's status as an officer, the lap-dance episode would not have obviously amounted to any other offense under the UCMJ. Similarly, Appellant's "wrongful intimate relationships" with Ms. MW and Ms. BG would not be criminal with the exception of the sexual intercourse, which was sepa-

rately charged as adultery.[16] The three specifications related to Appellant's attempts at impeding the investigation, however, implicate the offense of obstructing justice under Article 134, UCMJ. The elements of that offense are: (1) Appellant wrongfully did a certain act; (2) it was done in a specific case in which Appellant believed there were or would be criminal proceedings pending; (3) it was done with the intent to influence, impede, or otherwise obstruct the administration of justice; and (4) Appellant's conduct was to the prejudice of good order and discipline or service discrediting. 2016 *MCM*, pt. IV, ¶ 96.b. Asking another to either lie or to withhold relevant information during an investigation amounts to obstruction under this article. *United States v. Tedder*, 24 M.J. 176, 179 (C.M.A. 1987).

Appellant seeks to undermine his pleas to these five specifications by asserting other people either had poor credibility or had certain biases. We find his post-trial attempts to litigate his case unavailing, however. After consulting with his trial defense counsel, Appellant entered into a plea agreement in which he agreed to plead guilty to the offenses he was later convicted of. He not only pleaded guilty, but he entered into a comprehensive stipulation of fact and then explained directly to the military judge why he believed he was guilty. Appellant had the opportunity to plead not guilty and confront the witnesses against him at trial, but he chose not to do so, and he may not seek to litigate witness credibility related to the findings in his case at this late stage.

Appellant stipulated to all the conduct underlying the five specifications with the sole exception to the portion of the lap-dance specification alleging other enlisted military members were present. That portion was subsequently excised from the specification by the Government, rendering the alleged factual infirmity moot. He admitted he sought to have SSgt JC, Ms. MW, and Ms. BG all withhold information from investigators in order to hide his misconduct. Appellant further admitted the conduct compromised his standing as an officer. Notably, in discussing the specification regarding Appellant's attempts to have Ms. MW lie about the nature of their relationship, the military judge asked Appellant why he thought that conduct was wrong. Appellant answered,

> Once again it goes against the core values, on top of it impedes an investigation where commanders are expected to make a decision in administrative or disciplinary actions and if they don't have the full picture they can't accurately prescribe what actual actions need to take place, therefore, I now place the officer corps

---

[16] We recognize the two instances of sexual conduct between Appellant and both Ms. MW and Ms. BG together could have potentially been charged as indecent conduct, but the Government did not pursue that theory, nor did Appellant admit any of his conduct was indecent.

in jeopardy and let the officer corps down by my actions because as an officer we are looked to for information, correct information, because our jobs depend on it and security forces lives depend on it making sure that we have the correct information so if I cannot be trusted, how can they trust me and wartime situations or any other day-to-day situations.

Based upon our review of the record, we find no substantial basis in law and fact for questioning Appellant's guilty plea to these offenses.

### c. Adultery

Appellant was convicted of three specifications of adultery under Article 134, UCMJ, involving SSgt JC, Ms. MW, and Ms. BG. Had Appellant pleaded not guilty, the Government would have had to prove beyond a reasonable doubt that: (1) Appellant wrongfully had sexual intercourse with the women; (2) the women were married to other individuals at the time; and (3) Appellant's conduct was prejudicial to good order and discipline. *See* 2016 *MCM*, pt. IV, ¶ 62.b. The *Manual for Courts-Martial* offers various factors to consider in determining whether or not otherwise private adulterous conduct is actually prejudicial to good order and discipline. Among those factors are: the "co-actor's marital status, military rank, grade, and position;" the co-actor's spouse's military status; the impact on the co-actor's spouse's ability to perform his or her military duties; and whether the adultery "was accompanied by other violations of the UCMJ." 2016 *MCM*, pt. IV, ¶ 62.c.(2).

Appellant admitted he had sexual intercourse with these three women, and that each was married to an enlisted servicemember when he did so. Moreover, all three of those servicemember husbands were deployed away from their homes as part of their military duties when Appellant engaged in sexual relationships with their wives. In SSgt JC's case, Appellant's conduct also amounted to fraternization and was known to at least one junior member in SSgt JC's office. Ms. BG's husband fell under Appellant's command, and Appellant's relationship with Ms. BG became known within their unit. Neither at trial nor on appeal does Appellant claim he did not actually have sexual intercourse with the women. Instead, Appellant casts his relationships as private and disconnected from his military service. The evidence in Appellant's case, however, compels a contrary conclusion.

To be sure, there is no indication SSgt JC's, Ms. MW's, and Ms. BG's sexual involvement with Appellant was anything but willful, voluntary conduct on their parts. Nonetheless, the negative impact on good order and discipline in the military caused by an officer fostering sexual relations with servicemembers' spouses while those servicemembers are deployed is self-evident. Not only

are those servicemembers likely to be distracted from—and therefore less effective at—their assigned duties, but that officer's ability to credibly lead junior troops or to assume any position of trust will be severely, if not irreparably, compromised. The facts that TSgt TG fell directly under Appellant's command and that SSgt JC was tasked with providing Appellant military support services only further demonstrate the close tie between Appellant's misconduct and his military status. Finally, Appellant's adulterous misconduct involved other offenses: obstruction of justice with respect to all three women and fraternization in SSgt JC's case.

Again, we see no substantial basis for questioning Appellant's pleas. In reaching our conclusion on this point, we did not rely on the post-trial materials submitted by Appellant, as they fell outside the record. *Jessie*, 79 M.J. at 444–45. We did consider the materials for the limited purpose of better understanding the context of Appellant's assignments of error. We note, however, that even if we had fully considered those documents, there is nothing within them that would compel a different result.

## C. Sentence Severity

Appellant asserts that "the punishment is not commensurate with the crimes." He primarily argues that his conduct had little or no impact on his unit due to his conduct "being discreet and that people had already been separated from the military and happened outside the unit." He also suggests his punishment is disproportionate to offenses committed by senior officials whose "conduct is swept under the rug" in spite of the fact their offenses purportedly had far greater impacts.

We review issues of sentence appropriateness de novo. *See United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). Our authority to review a case for sentence appropriateness "reflects the unique history and attributes of the military justice system, [and] includes but is not limited to, considerations of uniformity and evenhandedness of sentencing decisions." *United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F. 2001) (citations omitted). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(d), UCMJ, 10 U.S.C. § 866(d). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense, the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (citation omitted). Although we have great discretion to determine whether a sentence is appropriate, we have no power to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

Sentence comparison with other cases is only called for in "those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases." *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999) (citations omitted). An appellant has the burden of establishing other cases are both "closely related" (for example, when they involve co-actors, a common scheme, or other direct nexus) and that his sentence is "highly disparate." *Id.*

Appellant's claims of minimal unit impact are undermined by his own words at his court-martial. Appellant stipulated that his conduct with TSgt TG's wife "caused controversy" in the unit, impacted TSgt TG's ability to perform his dues, and "eroded unit cohesion." As explained above, Appellant's relationship with SSgt JC was known to at least one of her subordinates, and all three servicemembers' husbands knew of Appellant's sexual relations with their wives. A1C JH was actually under Appellant's command and—as a member of Appellant's unit—she was undeniably aware of his position and conduct. Appellant's post-trial claims of only engaging in "discreet" conduct or only involving people who were no longer in the military are simply not credible in face of the evidence admitted at his court-martial. Similarly, Appellant's vague claim of others' conduct being "swept under the rug" is insufficient to lead us to conclude this is one of "those rare instances" in which we will compare his sentence to that of others.

We have considered the nature and seriousness of Appellant's offenses, his record of service, and all matters contained in the record of trial, and we conclude Appellant's sentence to a dismissal, confinement for 60 days, forfeiture of pay for three months, and a reprimand is not inappropriately severe. Appellant not only engaged in sexual conduct with the spouses of deployed enlisted servicemembers, but he had sexual relations with an Airman under his own command. Moreover, when he came under investigation, Appellant sought to recruit others in his attempt to obstruct that investigation by asking them to lie to investigators and delete text messages—destroy evidence, in other words. Although he appears to have otherwise performed satisfactorily in his military career, his misconduct significantly impaired his status as an officer, demonstrated his lack of fitness for military service, and directly prejudiced good order and discipline in the military. As a result, we will not modify his sentence.

## D. Completeness of the Record

### 1. Additional Background

Following our remand, Appellant's case was re-docketed with this court on 9 June 2021. We noted that several of the concerns we had raised in our original opinion had not been addressed, and we ordered the Government to show cause why we should not again return the record. Specifically, we noted: (1)

Prosecution Exhibit 1, the stipulation of fact, listed specific attachments, but no such attachments were included in the record of trial docketed with this court; (2) documents pertaining to adjudged and automatic forfeitures referred to attachments, but no attachments were included in the record; (3) several digital video discs (DVDs) in the record were labeled "SECRET," but were not properly handled as classified materials; and (4) there was no indication in the record that Appellant had executed a waiver of appellate representation after the convening authority's action.[17]

On 9 July 2021, the Government responded to our order, taking the following respective positions: (1) conceding the attachments to Prosecution Exhibit 1 are required components of the record of trial; (2) arguing that forfeiture documents are not required components of the record of trial, but that they are required to be attached to the record; (3) explaining the DVDs were erroneously marked as "SECRET," and do not actually contain any classified material; and (4) maintaining there is no requirement to attach a waiver of appellate counsel to the record of trial. The Government further submitted the missing documents to this court and asked us to attach the missing documents to the record under R.C.M. 1112(d)(2).

In support of the foregoing, the Government submitted a declaration from one of the trial counsel detailed to Appellant's court-martial, Captain (Capt) LM. In this declaration, Capt LM states the "SECRET" markings amounted to "a typographical error." He further explains that he sought and obtained a second waiver of appellate representation from Appellant, dated 6 July 2021. Finally, Capt LM attached copies of the attachments to the stipulation—which he certifies are true and accurate copies of those introduced at trial—along with Appellant's second waiver of appellate representation. The Government also submitted a declaration from TSgt TS, the paralegal responsible for compiling the record of trial. Attached to this declaration are documents which TSgt TS asserts were attached to the forfeiture-related documents which were included in Appellant's record of trial.

With respect to the attachments to Prosecution Exhibit 1, the first consists of pictures of the matching tattoos Appellant and Ms. MW had made in Venice—they read, "if it's meant to be, it'll be." The second attachment consists of

---

[17] *See United States v. Xu*, 70 M.J. 140 (C.A.A.F. 2011) (mem.) (stating that waiver of appellate counsel prior to convening authority's action is premature, legally invalid, and without effect); *see also* Air Force Instruction 51-201, *Administration of Military Justice*, ¶ 14.5.2 (18 Jan. 2019) ("If the accused initially declines appellate representation after sentence is announced, the accused must be given another opportunity to elect or decline appellate representation after the convening authority's action is served upon the accused.").

text messages between Appellant and Ms. MW referencing sexual activities and how they miss each other. The third attachment consists of text messages between Appellant and Ms. BG in which Appellant tells Ms. BG, "Just if anything play dumb if they do question you delete these messages obviously." Appellant also says, "If you talk to [MW] if she cares to know. Have her says we were best friends and yes we gat tattoos and hung out all the time. Then just plead the 5th to anything else. All she needs to say." The fourth attachment is a minute-long video of Appellant dancing on and in between the legs of a seated woman.

### 2. Law

We review the question of whether a record of trial is complete de novo. *United States v. Stoffer*, 53 M.J. 26, 27 (C.A.A.F. 2000). A complete record of trial includes all exhibits. R.C.M. 1112(b)(6); R.C.M. 1112(d)(2). An incomplete or defective record of trial may be returned to the military judge for correction. R.C.M. 1112(d)(2).

When an omission from a record of trial is substantial, such gives rise to a presumption of prejudice which the Government must rebut. *United States v. Harrow*, 62 M.J. 649, 654 (A.F. Ct. Crim. App. 2006) (citation omitted), *aff'd*, 65 M.J. 190 (C.A.A.F. 2007). Insubstantial omissions, however, do not give rise to such a presumption "or affect that record's characterization as a complete one." *United States v. Henry*, 53 M.J. 108, 111 (C.A.A.F. 2000). We approach the question of what constitutes a substantial omission on a case-by-case basis. *United States v. Abrams*, 50 M.J. 361, 363 (C.A.A.F. 1999) (citation omitted). In doing so, we ask whether the omitted material was either qualitatively of quantitatively substantial. *United States v. Davenport*, 73 M.J. 373, 377 (C.A.A.F. 2014). "[O]missions are qualitatively substantial if the substance of the omitted material 'related directly to the sufficiency of the Government's evidence on the merits[ ]' . . . ." *Id.* (quoting *United States v. Lashley*, 14 M.J. 7, 9 (C.M.A. 1982). When "the totality of omissions . . . becomes so unimportant and so uninfluential when viewed in the light of the whole record, that it approaches nothingness[,]" such omissions will not be considered substantial. *Id.* (quoting *United States v. Nelson*, 13 C.M.R. 38, 43 (C.M.A. 1953)).

### 3. Analysis

We considered Capt LM's declaration and its attachments as well as TSgt TS's declaration to determine whether to return Appellant's record of trial for

correction.[18] In light of the evidence of Appellant's 6 July 2021 waiver of Appellate counsel, we consider the matter of Appellant's premature waiver of appellate counsel moot.[19]

The missing documents regarding Appellant's forfeitures were part of Appellant's request to defer those forfeitures. While the omission of those documents would not render the record incomplete under R.C.M. 1112(d)(2), such a request is required to be attached to the record before it is forwarded for appellate review. R.C.M. 1112(f)(4).

As the record currently stands, however, it is still incomplete as a result of the missing attachments to Prosecution Exhibit 1. Assuming these missing attachments amount to a substantial omission, we nonetheless conclude the omission is harmless beyond a reasonable doubt. We first note Appellant has not raised this issue on appeal or claimed any prejudice even after we highlighted the matter in our earlier opinion remanding this case. Appellant similarly did not raise the issue after we ordered the Government to show cause why we should not return the case based, in part, upon the missing items. Second, having reviewed the attachments submitted by the Government, we conclude that the evidentiary significance of the attachments is adequately explained in the text of Prosecution Exhibit 1, the stipulation of fact. The images of Appellant's and Ms. MW's tattoo, the video of the lap dance, and the specific

---

[18] The fact we granted the Government's motion to attach does not change the fact that the documents are still missing from the record of trial. Instead, we use the declarations and attachments in order to perform our responsibilities under Article 66, UCMJ, 10 U.S.C. § 866. *See, e.g.*, *United States v. King*, No. ACM 39583, 2021 CCA LEXIS 415, at *29–30 (A.F. Ct. Crim. App. 16 Aug. 2021) (unpub. op.) (considering a military judge's ruling which was missing from the record but was provided during appellate processing in order to assess whether the appellant was prejudiced by the ruling's omission from the record).

[19] The decision in *Xu* regarding waiver of appellate representation seems to be premised on the notion that a servicemember could not waive appellate *review* before the convening authority took action in his or her case. *United States v. Smith*, 34 M.J. 247, 249 (C.M.A. 1992). This was based on the then-applicable version of Article 61, UCMJ, 10 U.S.C. § 861. *Id.* Under the version of Article 61, UCMJ, now in effect, a servicemember may waive the right to appellate review only after the entry of judgment. We see no reason why this requirement relating to appellate review would not extend to appellate representation, as in *Xu*. In Appellant's case, he first waived appellate representation on 23 June 2020, but judgment was not initially entered until 15 September 2020. Appellant's subsequent waiver has remedied this infirmity. We agree with the Government that the written waiver of appellate counsel is not a required component of a record of trial.

texts add little to the detailed stipulation, Appellant's answers during the providence inquiry, and the witness testimony. While the attachments should have been included in the record of trial, we conclude the fact they were left out is harmless.[20]

### E. Deferment Request

Although not raised by Appellant, we note the convening authority failed to properly act on Appellant's post-trial request to defer portions of his sentence. Appellant's plea agreement required the military judge to adjudge forfeitures in an amount between $1,000.00 and $2,500.00 "a month." On 23 June 2020, the military judge sentenced Appellant for forfeit $1,500.00 pay per month for three months, along with confinement for 60 days. By virtue of being sentenced to both confinement and a dismissal, Appellant would automatically forfeit all pay and allowances while in confinement—beginning 14 days after his sentence was adjudged—by operation of Articles 57(a)(1)(A) and 58b(a), UCMJ, 10 U.S.C. §§ 857(a)(1)(A), 858b(a).

On 1 July 2020, just over a week after he was sentenced, Appellant asked the convening authority to defer his adjudged confinement as well as his automatic forfeitures until the military judge entered judgment in his case. Appellant primarily justified his request for the forfeiture deferment by pointing to his child support obligations for his son.[21] Appellant further asked the convening authority—in the event the convening authority denied this deferment request—to waive Appellant's automatic forfeitures for the benefit of his children.

Under Articles 57(b)(1) and 58b(a)(1), UCMJ, the convening authority had the power—upon Appellant's request—to defer any of Appellant's adjudged confinement, adjudged forfeitures, and automatic forfeitures until entry of judgment. 10 U.S.C. §§ 857(b)(1), 858b(a)(1). A convening authority's decision on a deferment request must be in writing, served on the member making the request, and attached to the record of trial. R.C.M. 1103(d)(2), 1112(f)(1)(4). If the request is denied, the convening authority must include the basis for that

---

[20] The DVDs labeled "SECRET" were removed from the record of trial and returned to the Government for proper storage, declassification, or correction of the labels or content as appropriate. The labels were subsequently modified to remove the classified markings and the DVDs have been returned to the record of trial. We emphasize that careful attention to the assembly and processing of the record would have avoided this issue and the others we have noted.

[21] Appellant had a child with a local civilian woman in September 2017 and was paying child support at the time of his court-martial.

denial in the written decision. *See United States v. Sloan*, 35 M.J. 4, 6–7 (C.M.A. 1992), *overruled on other grounds*, *United States v. Dinger*, 77 M.J. 447 (C.A.A.F. 2018).

Two months after sentencing—on 25 August 2020—the convening authority signed a Decision on Action memorandum which included his decision on Appellant's request. Without providing any analysis or discussion, the convening authority denied Appellant's request to defer his confinement.[22] By not including a basis for the denial, the convening authority erred.

In this memorandum, the convening authority also set out his decision to defer forfeiture of $1,060.00 pay per month starting on the fourteenth day after sentencing and lasting through Appellant's release from confinement. In our initial review of this case, we noted it was unclear whether the convening authority intended to defer $1,060.00 pay per month of the automatic forfeitures, or if he intended to defer "all of the automatic forfeitures," since his decision memorandum said both. *Taylor*, unpub. op. at *8. Compounding this issue, the convening authority incorrectly stated Appellant had asked for deferment of "all of the adjudged and automatic forfeitures," when Appellant had only asked for deferment of the *automatic* forfeitures.[23] In the convening authority's new Decision on Action memorandum, he correctly stated Appellant only requested deferment of the automatic forfeitures, but he changed the memorandum to indicate that he was deferring "$1,060.00 pay per month of the automatic forfeitures and all of the *adjudged* forfeitures." (Emphasis added). The corrected entry of judgment also reflects these changes. The convening authority, however, had no authority to defer Appellant's adjudged forfeitures, because Appellant never requested those forfeitures be deferred. *See, e.g.*, *United States v. Ramirez*, No. ACM S32538, 2020 CCA LEXIS 20, at *17 (finding a convening authority's purported deferral in the absence of a request by the appellant to be "ultra vires"). Thus, the convening authority erred in this regard.

As noted above, the convening authority could defer Appellant's forfeitures until the entry of judgment, but the military judge did not enter judgment until 15 September 2020, nearly three months after Appellant's court-martial concluded. Because Appellant was subject to automatic forfeitures only while in confinement, those forfeitures expired well before judgment was initially entered and likely before the convening authority signed the original Decision on Action memorandum. In any event, due to our remand in this case, the effective

---

[22] After we remanded Appellant's case, the convening authority issued a new Decision on Action memorandum, dated 2 June 2021. This new memorandum likewise includes no rationale for the denial.

[23] In his deferment request, Appellant's counsel explained that Appellant was only asking for deferment of forfeitures in excess of those adjudged by the military judge.

date of the entry of judgment was not until 7 June 2021—long after the expiration of Appellant's sentence to confinement. Thus, while Article 57(b)(1), UCMJ, apparently only contemplates a deferment ending on the entry of judgment and not some earlier date unless the deferment is affirmatively rescinded, the truncated deferment here did not operate to Appellant's detriment in any perceptible way.

Finally, the convening authority declined to waive the automatic forfeitures for the benefit of Appellant's children. He provided no rationale for this decision, but he was not required to do so. *See United States v. Edwards*, 77 M.J. 668, 670 (A.F. Ct. Crim. App. 2018) (concluding that, unlike a decision on a deferment request, decisions on waiver requests need not be in writing or contain any rationale for a denial).

We review a convening authority's decision on a deferment request for an abuse of discretion. *Sloan*, 35 M.J. at 6. Appellant has not alleged the convening authority denied his deferment request regarding his confinement and automatic forfeitures for any improper purpose, nor has he shown any prejudice. Indeed, Appellant has not even raised this issue on appeal. Having considered the entire record, we find no evidence the convening authority abused his discretion in partially denying Appellant's deferment request, and we have identified no prejudice to Appellant flowing from the convening authority's failure to explain his rationale for doing so. We therefore find the error harmless.

Although the convening authority improperly attempted to defer Appellant's adjudged forfeitures when Appellant made no prerequisite request, we conclude no corrective action is warranted. At the time of his court-martial, Appellant was receiving $6,721.50 per month in basic pay plus some indeterminate amount of allowances, all of which was subject to the automatic forfeiture provision of Article 58b(a)(1), UCMJ. Of this amount, Appellant was sentenced to forfeit $1,500.00 per month for three months, leaving more than $5,200.00 per month subject to the automatic forfeiture provision and available to be deferred through the entry of judgment.[24] As a result, the convening authority's deferral of $1,060.00 per month of the automatic forfeitures was unimpeded by the adjudged forfeitures. In other words, whether or not the adjudged forfeitures were deferred during confinement had no impact on the $1,060.00 pay per month of automatic forfeitures which was effectively deferred and presumably paid to Appellant.

---

[24] Considering Appellant was living off-base overseas, this amount was likely substantially higher.

We pause to note these issues could have been easily avoided had those involved paid closer attention to what Appellant was asking for, what the convening authority was authorized to do, and what was required to be included in a deferment denial. We caution military justice practitioners to dedicate the attention called for in acting on servicemembers' requests for relief.

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court